I. M. DACH UNDERWEAR COMPANY *v.* EMPLOYMENT SECURITY COMMISSION.

1. UNEMPLOYMENT COMPENSATION—PURPOSE OF STATUTE—INVOLUNTARY UNEMPLOYMENT.

   The employment security act undertook to deal with the problem of involuntary unemployment (PA 1936 [Ex Sess], No 1, as amended).

2. LABOR RELATIONS—VACATION PERIOD—UNION CONTRACTS.

   The purpose of a provision of labor union's contract with the employer fixing a definite time for vacation periods was primarily for the benefit of the employees.

3. UNEMPLOYMENT COMPENSATION—VACATION PERIOD.

   Employees who were not entitled to vacation pay for period during which plant was shut down for vacation purposes, pursuant to clause of contract between labor union, the sole bargaining agent for the employees, and the employer, were not involuntarily unemployed for such period, hence, were not entitled to unemployment compensation therefor (PA 1936 [Ex Sess], No 1, § 48, as amended by PA 1951, No 251).

4. WORDS AND PHRASES—VACATION.

   A vacation is a period of freedom from duty, not an end of employment.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 48 Am Jur, Social Security, Unemployment Insurance and Retirement Funds § 10.
[2, 8, 9] 31 Am Jur, Labor § 96 *et seq.*
[3] 48 Am Jur, Social Security, Unemployment Insurance and Retirement Funds § 15.
[5] 31 Am Jur, Labor § 99.
[6, 10] 48 Am Jur, Social Security, Unemployment Insurance and Retirement Funds § 7.
[7] 48 Am Jur, Social Security, Unemployment Insurance and Retirement Funds § 46 *et seq.*

5. LABOR RELATIONS — UNION CONTRACT — VACATIONS — UNEMPLOY-
MENT.

A labor union has the right, as a sole collective-bargaining
agency, to bind its members by a contract as to vacation
periods whereby those who have not been employed by the
employer for a prescribed length of time may not be entitled
to be considered "unemployed" during such period for pur-
poses of employment security act (PA 1936 [Ex Sess], No 1,
§ 48, as amended by PA 1951, No 251).

6. UNEMPLOYMENT COMPENSATION — VACATION — QUESTION OF LAW
—UNDISPUTED FACTS—CONSTRUCTION OF STATUTE.

The question of whether a claimant for unemployment compen-
sation benefits was "unemployed" during vacation period pre-
scribed by union contract may properly be regarded as one of
law, involving the interpretation of a statute, where the facts
are not in dispute (PA 1936 [Ex Sess], No 1, § 48, as amended
by PA 1951, No 251).

7. SAME—UNDISPUTED FACTS—REVERSAL OF APPEAL BOARD.

Claim that provision of statute that decision of appeal board
of the employment security commission may be reversed by
the circuit court only if contrary to the great weight of the
evidence precluded reversal of board's finding that claimants
were entitled to unemployment compensation for vacation pe-
riod required by labor union contract with employer *held*, un-
tenable, where facts were not in dispute and question presented
thereby may properly be regarded as one of law (PA 1936
[Ex Sess], No 1, § 48, as amended by PA 1951, No 251).

8. SAME — UNION CONTRACT — WAIVER — INVOLUNTARY UNEMPLOY-
MENT.

Labor union's contract with employer may not be said to be invalid
because it, in effect, waived an employee's right to unemploy-
ment compensation benefits, where circuit judge properly found
as a matter of law that partially as a result of the contract
certain employees were not involuntarily unemployed, there be-
ing no such thing as a waiver as to a right that does not exist
(CL 1948, § 421.31).

9. SAME—VACATION—UNION CONTRACTS.

The employment security act may not be regarded as prohibiting
an agreement between the employer and employee with ref-
erence to a vacation for the latter, to be taken at a fixed time,
an agreement which would be equally binding whether made
by the employee personally or by his union in his behalf, as
such an agreement is not one to waive rights to benefits to

which an employee would otherwise be entitled (CL 1948, § 421.31).

10. SAME—COSTS—CONSTRUCTION OF STATUTES.

No costs are allowed in proceeding to recover unemployment benefits for claimants who had not worked minimum period to be entitled thereto under union contract with employer, the construction of a statute on novel question being involved (PA 1936 [Ex Sess], No 1, as amended).

SMITH, EDWARDS, and BLACK, JJ., dissenting.

Appeal from Jackson; Boardman (Harry D.), J. Submitted June 6, 1956. (Docket No. 24, Calendar No. 46,765.) Decided December 28, 1956.

Certiorari by I. M. Dach Underwear Company, a corporation, against Michigan Employment Security Commission and its Appeal Board challenging validity of order granting unemployment compensation to certain employees not receiving full pay during vacation arranged under union contract. Mary Bretes and others, employees, intervene. Order setting aside decision, reversing commission and denying compensation. Intervening defendants appeal. Affirmed.

*McKone, Badgley, Domke & Kline,* for plaintiff.

*Murray Finley (Rothe, Marston, Mazey, Sachs & O'Connell,* of counsel), for intervening defendants.

*Amicus Curiae:*

*Beaumont, Smith & Harris (Frank E. Cooper,* of counsel), for Michigan Employers' Unemployment Compensation Bureau.

CARR, J. This case involves the claims of the appellants to unemployment compensation for the first week in July, 1951. The facts in the case are not in

dispute. For a number of years prior to the period in question the I. M. Dach Underwear Company has operated a manufacturing business in the city of Jackson. For varying periods less than 1 year in duration, prior to July 1, 1951, appellants were employed by the company, all of them being members of the Amalgamated Clothing Workers of America. Since 1943 said union has been recognized as the sole collective-bargaining agency for the company's employees who were members thereof.

It further appears from the record that for a number of years prior to 1951 the company had annually granted a vacation to its employees for the week in which July 4th fell. Under date of November 21, 1950, the company and the union entered into a contract relating to various matters affecting the employment of members of the union, and specifying various incidents thereof. Article 5 of the contract read as follows:

"ARTICLE 5

"VACATIONS

"In appreciation of the loyal and faithful service of the employees, the employer agrees that each employee who has been continuously employed for more than 12 months on the Saturday last preceding July 4th shall be entitled to vacation pay as follows:

"Those employees who have been continuously employed for 1 year preceding July 4th, shall be entitled to 1 week's vacation pay, and those employees who have been continuously employed for 5 years, or more, on the Saturday last preceding July 4th shall be entitled to 2 weeks' vacation pay. Vacation pay shall be based upon the employee's average 40-hour week earnings computed 6 weeks prior to July 4th in the year in which the vacation shall fall.

"TIME FOR VACATIONS

"All vacations shall be taken during the week in which July 4th shall fall and the week immediately.

following for those employees who are entitled to 2 weeks' vacation pay.   In the event that the management shall determine that the plant shall operate during said succeeding week, then the management shall have the privilege of so doing, providing that the entire factory shall work during said succeeding week.   If the company feels it is necessary to work the entire factory during said second or succeeding week vacation period, they shall notify the employees prior to June 1st of their intention to work during said succeeding second week vacation period.   It is understood and agreed that any employee who has not worked during the entire 12 months preceding July 1st, shall not be entitled to any vacation pay."

In accordance with the contract the company, prior to July 1, 1951, posted notices on the plant bulletin board stating in substance that the vacation period would begin July 1st.   Appellants herein, not having worked during the entire 12 months preceding that date, under the final provision of the excerpt of the contract above quoted were not entitled to vacation pay, and they, with others similarly situated, filed claims for unemployment compensation under the provisions of the statute.[*]

We are concerned in the instant case with provisions of the Michigan employment security act, as amended by PA 1951, No 251, effective June 17, 1951. For obvious reasons, subsequent amendments are not involved in the instant controversy.   The employment security commission denied compensation on the ground that the applicants were on vacation and, hence, not available for work.   The conclusion reached was affirmed on redetermination.   On appeal the referee reversed the holding of the commission, and the appeal board affirmed the order of the referee.   On certiorari the circuit court of Jackson

[*] PA 1936 (Ex Sess), No 1, as amended (CL 1948 and CLS 1952, § 421.1 et seq. [Stat Ann 1950 Rev and Stat Ann 1951 Cum Supp § 17.-501 et seq.]).

county reversed the appeal board, holding that the applicants were voluntarily unemployed during the week in question, and for that reason were not entitled to compensation. From the judgment entered the claimants have appealed to this Court.

On behalf of appellants it is urged that during the week in question they were "unemployed" within the meaning of the term as used in sections 28 and 48 of the statute, as amended by PA 1951, No 251 (CLS 1952, § 421.28 [Stat Ann 1951 Cum Supp § 17.530]) and (CLS 1952, § 421.48 [Stat Ann 1951 Cum Supp § 17.552]). Special emphasis is placed on the latter section which, at the time in question here, read as follows:

"Sec. 48. An individual shall be deemed 'unemployed' with respect to any week during which he performs no services and with respect to which no remuneration is payable to him, or with respect to any week of less than full-time work if the remuneration payable to him is less than his primary weekly benefit rate: Provided, That any loss of remuneration incurred by an individual during any week resulting from any cause other than the failure of his employing unit to furnish full-time, regular employment shall be included as remuneration earned for purposes of this section and of subsection (c) of section 27 of this act: Provided further, That the total amount of remuneration thus lost shall be determined in such manner as the commission shall by regulation prescribe. For the purposes of this act, an individual's primary weekly benefit rate shall mean the weekly benefit rate shown in column B of the table in section 27 (b), which is on the line applicable to the individual's wage class (column A).

"All amounts paid to or due to a claimant from an employing unit or former employing unit for a vacation or a holiday, or in lieu of notice, for the purposes of determining the claimant's benefit rights, shall be deemed remuneration for the period

designated by the contract or agreement providing for the payment, or if there be no such contract or agreement providing for the payment, then for the period designated by the employing unit or former employing unit: Provided, however, That payments in the form of termination, separation, severance or dismissal allowances, back pay awards and bonuses, shall not be deemed wages or remuneration within the meaning of this section."

In accordance with general principles of statutory construction, the pertinent provisions of the Michigan employment security act must be read in the light of the purpose of the legislature in enacting it. Section 2 thereof (CL 1948, § 421.2 [Stat Ann 1950 Rev § 17.502]) declares such purpose in clear and unequivocal terms. It reads as follows:

"Sec. 2. Declaration of policy. The legislature acting in the exercise of the police power of the State declares that the public policy of the State is as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this State. Involuntary unemployment is a subject of general interest and concern which requires action by the legislature to prevent its spread and to lighten its burden which so often falls with crushing force upon the unemployed worker and his family, to the detriment of the welfare of the people of this State. Social security requires protection against this hazard of our economic life. Employers should be encouraged to provide stable employment. The systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment by the setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own, thus maintaining purchasing power and limiting the serious social consequences of relief assistance, is for the public good, and the general welfare of the people of this State."

It thus appears that, in the interest of the public welfare, the legislature of the State undertook to deal with the problem of involuntary unemployment. The declaration of policy is significant in the interpretation of the various provisions of the statute through which the ultimate result sought was to be attained.    Clearly the act was intended primarily for the benefit of those involuntarily unemployed, in other words, those who, capable of working, are prevented from doing so other than by the results of their own acts.

In the instant case these appellants through their agency entered into a definite agreement with the employer that the vacation period each year, recognized by the parties as necessary or at least proper, should be the week in July in which the 4th of the month fell and, subject to certain provisions, the ensuing week for those having the required seniority.  Such agreement was not for the sole benefit of the employer but was primarily for the benefit of the employees.   It will be noted also that the contract did not leave the fixing of the time for the annual vacation to the employer, nor to subsequent mutual agreement by the parties.  The provision of the contract was made certain and definite to the end that the parties thereto, including the employees for whom the union acted, might be apprised of their rights and obligations.

The question at issue has not been squarely raised in this State in any prior litigation.   However, the courts in other States having statutes very similar in form and substance to the Michigan act have had occasion to consider the interpretation thereof and, likewise, the force and effect of a contract of the nature here involved.   In *Beaman v. Bench,* 75 Ariz 345 (256 P2d 721), the statute involved, like the Michigan act, contained a statement of public policy emphasizing the necessity of relief from the consequences of "involuntary unemployment."   There, as

here, there was in existence a contract between the employer and a union acting as the exclusive bargaining agency for its members, covering, among other matters, vacation periods. It was specifically set forth in the contract that the vacation period for the production departments maintained by the employer should begin with Monday of the week following July 4th. The agreement also specified the amount of vacation time on the basis of length of service. It was found that in the year 1951 more than half of the employees were entitled to a vacation. It was held that this situation, for practical reasons, forced a shutdown of the employer's operations during the week in question and that, in consequence, employees not entitled to vacation pay, who were in effect required to take their annual vacation at the time specified in the contract, were not entitled to unemployment compensation. In commenting on the situation, it was said (p 349):

"Appellee and the claimants he represents must be deemed to have agreed to any shutdown compelled by the company's contractual obligations to grant leaves at a specified time. They voluntarily entered into the agreement, were voluntarily working under all of the provisions thereof, insisted upon the enforcement of its terms concerning the vacation period, and must be held to have consented to the results of such enforcement to the same extent as if they had expressly asked for the layoff. The claims deputy, the appeal tribunal and the employment security commission were all correct in ruling that the appellee and those he represents were voluntarily unemployed and not entitled to benefits under the employment security act."

In reaching its conclusion the Arizona court recognized that a distinction is to be made between the effect of shutdowns required by virtue of contract and those which occur at the employer's option. On

the basis of such distinction the court differentiated *American Bridge Co.* v. *Review Board of Indiana Employment Security Division,* 121 Ind App 576 (98 NE2d 193); and *Schettino* v. *Administrator, Unemployment Compensation Act,* 138 Conn 253 (83 A2d 217). It was pointed out that in the Connecticut case the employer had the right to designate a vacation period at any time between May and October, including a time during which the plant might be shut down for other reasons, and in the Indiana case the factual situation disclosed that the shutdown was for the purpose of taking inventory, without any causal connection between the suspension of operations and the carrying out of the union contract.

In *Jackson* v. *Minneapolis-Honeywell Regulator Company,* 234 Minn 52 (47 NW2d 449), the court, after considering provisions of the statute of the State and decisions from other jurisdictions, held that:

"Where an employer's plant was closed down for 2 weeks primarily for vacation purposes pursuant to a union contract with employer, and an employee, who was a member of the union but not entitled to vacation pay because of lack of necessary length of service, filed a claim for benefits under the Minnesota employment and security law for the vacation period, such unemployment *held* to be voluntary, precluding employee from right to unemployment compensation benefits." (Syllabus by the court.)

In reaching its conclusion the court (p 58) quoted from *In re Employees of Buffelen Lumber & Manfg. Co.,* 32 Wash2d 205, 210 (201 P2d 194), as follows:

" 'The claimants were parties, through their union, to the agreement which had to do with vacations. They were bound by the terms of that agreement to the same effect as they were bound by the working agreement. *In re Employees of Polson Lumber & Shingle Mills,* 19 Wash2d 467 (143 P2d 316).

" 'It is clear that claimants must be held to the liabilities imposed by the contract, and must suffer the result of any provisions in the agreement which is to their detriment. The contract relating to vacations determined which employees were to be paid during vacation periods. The claimants cannot complain that they were not mentioned or their rights ascertained, the reason being that their union spoke for them to the same extent and to the same effect as they could as individuals.' "

The court (p 56) also quoted a provision of the Minnesota statute declaring that:

" 'An individual shall be deemed "unemployed" in any week during which he performs no service and with respect to which no wages are payable to him, or in any week of less than full time work if the wages payable to him with respect to such week are less than his weekly benefit amount.' "

Said provision is analogous to the language of section 48 of the Michigan act, on which appellants rely. The Minnesota court in considering the argument based on the statute declared that the purpose of the legislature, as indicated by the declaration of policy and general purposes, was to deal with evils resulting from "involuntary unemployment." Because the shutdown of the employer's plant occurred in accordance with the contract between the union, of which claimant was a member, and the company, the court concluded that claimant's unemployment was not involuntary, and that under the statute as interpreted he was not entitled to compensation. This decision was adhered to in the later case of *Johnson* v. *LaGrange Shoe Corporation,* 244 Minn 354 (70 NW2d 335).

In harmony with the decisions above cited is *Philco Corporation* v. *Unemployment Compensation Board of Review,* 175 Pa Super 402 (105 A2d 176). Involved in that case were contracts, identical in their

material provisions, between unions representing the unemployment compensation claimants, and the employer. One of the provisions of said agreements contemplated an annual vacation period with a discontinuance of operations by the company. The vacation for the year 1952 was declared in accordance with said contract. As in the case at bar, it appeared that the claimants, who were not entitled to vacation pay, were ready and willing to accept suitable work if tendered to them during the 2 weeks fixed as the vacation period. Holding that the employer had acted in accordance with the contract, and had in effect recognized an obligation imposed thereby, the court pointed out that the unions were the exclusive bargaining agents for their members, and that claimants were bound by agreements relating to labor-management, including vacations and vacation pay. Based on this situation the court concluded that claimants' unemployment was voluntary and, hence, not compensable. The court further declared that (p 408):

"Moreover in a real sense claimants were not unemployed and for that reason their idleness during the vacation period was not compensable. They were not laid off; there was no termination of employment nor even suspension of the employer-employee relationship during the period. A vacation is a period of freedom from duty, not an end of employment. *Dauber's Case*, 151 Pa Super 293 (30 A2d 214). Their continued employment was insured by their bargaining agreements; their names were still on the pay roll even though they did not receive vacation pay. The contract of employment persisted, under which they returned to their work at the end of the vacation period without loss of seniority. The agreements in article 2 provide for a work week of 40 hours of 8 hours per day, from Monday through Friday. The scheduled vacation period was no different in principle from the normal uncompensated

week-end shutdown from Friday to the following Monday, incident to the 40-hour week."

The supreme court of New Jersey in *Glover* v. *Simmons Company,* 17 NJ 313 (111 A2d 404), had before it a contract between a union, representing claimant for unemployment compensation, and the employer, under which the vacation period for the year 1953 was fixed commencing July 6th. It was held that the contract was binding on members of the union, and that claimant's unemployment during said period was voluntary. There, as in the case at bar, he had not worked for the employer a sufficient length of time to entitle him to vacation pay under the contract. It was recognized that the establishment of a vacation period for employees was a proper matter to be included in the contract, the legislature not having spoken specifically with reference thereto. It may be further noted that the New Jersey statute contains a provision similar to the first sentence found in section 48 of the Michigan act, above quoted, on which appellants rely.

We think the reasoning of the above decisions persuasive. In accord therewith are: *Mattey* v. *Unemployment Compensation Board of Review,* 164 Pa Super 36 (63 A2d 429); *General Electric Company* v. *Unemployment Compensation Board of Review,* 177 Pa Super 49 (110 A2d 258); *Claim of Rakowski,* 276 App Div 625 (97 NYS2d 309). Under the facts in the case before us we conclude that the claimants were not "involuntarily unemployed," but, rather, that the situation in which they were placed as a result of the closing of their employer's plant for the first week in July, 1951, resulted from the contract made in their behalf by their collective-bargaining agency, the union of which they were members. The weight of authority clearly supports the judgment entered in circuit court. The right of a labor union

to bind its members, for whom it is the sole collective-bargaining agency, by a contract of the character here involved was recognized by this Court in *Chrysler Corp.* v. *Smith,* 297 Mich 438 (135 ALR 900) ; and in *General Motors Corp.* v. *Unemployment Compensation Commission,* 331 Mich 303.

As before stated, the question here involved is one of first impression in Michigan. Counsel have called attention to *Hubbard* v. *Unemployment Compensation Commission,* 328 Mich 444. However, the question there at issue was essentially different from that presented here. As pointed out in the opinion of the Court, the contract between the employer and the union to which claimants belonged did not provide for a vacation. In *Renown Stove Company* v. *Unemployment Compensation Commission,* 328 Mich 436, it was declared that the objective sought to be gained by the legislature in the enactment of the statute was protection against evils incident to involuntary unemployment. This case likewise presented a different factual situation, and different issues, than are before us in the instant proceeding.

Counsel direct attention to CLS 1952, § 421.38 (Stat Ann 1951 Cum Supp § 17.540), which contains a provision to the effect that the decision of the appeal board on a question of fact may be reversed by the circuit court only if contrary to the great weight of the evidence. It is argued in substance that the questions presented to the circuit judge in the instant case involved matters of fact rather than issues of law. As before stated, however, the facts in the proceeding are not in dispute. A like situation arose in *Ford Motor Co.* v. *Unemployment Compensation Commission,* 316 Mich 468, where it was held:

"Where facts were not in dispute as to claimant's availability for work, the question of whether she was entitled to benefits under the unemployment

compensation act may properly be regarded as one of law, involving the interpretation of a statute (PA 1936 [Ex Sess], No 1, as amended)." (Syllabus 6.)

Likewise, in *Hubbard* v. *Unemployment Compensation Commission, supra,* it was held that under the record before the Court the facts were not in dispute but, rather, that the real issue was as to the significance of the facts in the light of the statute and of the contract between the parties, and that the question raised, in consequence, was one of law. We think the claim advanced in the instant case is without merit.

A further question is suggested with reference to the validity of the contract between the union and the employer. Section 31 of the Michigan employment security act (CL 1948, § 421.31 [Stat Ann 1950 Rev § 17.533]) forbids agreements by an individual to waive, release, or commute his rights under the statute. In effect the claim is that if the contract between the employer and the union in this case is construed as inconsistent with the right of claimants to unemployment compensation it comes within the inhibition imposed by the legislature. However, the primary question here involved is whether claimants were involuntarily unemployed. If not, the circuit judge was right in holding that they were not entitled to unemployment compensation. There may not be a waiver as to a right that does not exist.

The statute may not be regarded as prohibiting an agreement between employer and employee with reference to a vacation for the latter, to be taken at a fixed time. Such an agreement would be equally binding whether made by the employee personally or by his union in his behalf. We think the claim advanced is well answered by the Minnesota supreme

court in *Jackson* v. *Minneapolis-Honeywell Regulator Company, supra.* It was there said (pp 61, 62):

"The agreement is not one to waive rights to benefits which an employee otherwise would be entitled to, but an agreement for a 2 weeks' vacation leave or voluntary absence from work. An agreement between the employer and its employee providing for a 2 weeks' leave for the individual employee certainly cannot be interpreted to mean an agreement to waive benefits and therefore prohibited. Such an agreement made collectively by the union should not be placed in a different status. There is an important distinction between an agreement for a leave or vacation shutdown which gives rise to no unemployment compensation benefits and a collusive agreement that unemployment compensation benefits be waived."

The circuit court correctly determined the issues involved in the case, and the judgment entered is affirmed. In view of the nature of the questions involved, no costs are allowed.

DETHMERS, C. J., and SHARPE, BOYLES, and KELLY, JJ., concurred with CARR, J.

SMITH, J. (*dissenting*). I can agree to no construction of a statute which gnaws out its bowels.* Here is a woman who wants work, who needs work and who has had her job taken from her against her will. When she applies for compensation, relying on the statute enacted for her economic security, she is told that what really happened to her was that she asked for a vacation and got it. The result warrants searching inquiry. Whenever the law says that what a person did, legally, is the opposite of what he did actually, that when he shouted "No," what he really (legally) did was to whisper "Yes,"

---

* *Viperina est expositio quae corrodit viscera textus.*

then explanation is due our people that they may guard against the evils of clear speech and forthright expression.

We will consider in detail the case of Mary Bretes, the first of the petitioners herein. She had worked for the petitioner and appellee about 3–1/2 months at the time of the incidents about to be described. Prior to that she had been out of work for about a month. She testified that when petitioner's plant closed she registered for other work, was available for it, and would have accepted it. No work being found, and there being no ineligibility, she claimed unemployment compensation for the week involved and she cites to us section 48 of the statute (CLS 1952, § 421.48 [Stat Ann 1951 Cum Supp, § 17.552]), reading as follows:

"Sec. 48. An individual shall be deemed 'unemployed' with respect to any week during which he performs no services and with respect to which no remuneration is payable to him, or with respect to any week of less than full-time work if the remuneration payable to him is less than his primary weekly benefit rate."

There is no doubt that she performed no services during the week in question and that, with respect to it, no remuneration was payable to her. Yet Mr. Justice Carr's opinion holds that she is not entitled to compensation. She is not, we are told, because, in effect, she was on a vacation of her own choosing. We may well ask at this point, if this is a vacation, what is a layoff?

This case, this industry, cannot be divorced from the past. We have here a segment of what is known as the needle trades. It has a long-established custom, that of an annual closing during the week of July 4th. Prior to the time of the union's "coming in," this was merely an annual layoff of 1 week.

With 2 or 3 exceptions it was without pay. Thus the union contract did not initiate the annual shutdown. What it initiated was regular pay for certain employees during the traditional shutdown period. In other words, this is not a case where the workmen request, and after negotiations, obtain, a vacation period. It was not, as the referee well puts it, "a concession, not a fringe benefit, and not a favor of any kind granted to the employees but, instead, an acknowledgment of a custom for the benefit of the employer." We note in passing, that our Brother states "Such agreement was not for the sole benefit of the employer but was primarily for the benefit of the employees." We cannot agree. The referee's finding, as above quoted, was to the contrary, and we find nothing in the opinion of the appeal board or the circuit court pointing to any weight of the evidence, great or small, in derogation thereof.

Precisely what, then, did the particular union contract say? We will turn to the contract itself. Article 5 thereof is entitled "Vacations." It deals, however, not with vacations as such, but with vacation pay. The emphasis is understandable. The plant traditionally closed during the week of July 4th. What was at issue was pay. Accordingly it provides that "Those employees who have been concontinuously employed for 1 year preceding July 4th, shall be entitled to 1 week's vacation pay, and those employees who have been continuously employed for 5 years, or more, on the Saturday last preceding July 4th shall be entitled to 2 weeks' vacation pay." What does it say of the others, of the junior employees who had not the requisite seniority for pay during the closing period? Nothing. The agreement, as to them, was silent. There is no agreement, express or implied, no hint, no intimation, that those not entitled to vacation pay should be on vacation during such period. The understanding of

the company, was, in fact, expressly contrary thereto. Thus it is that we find, on June 18th, the employer writing to the Michigan employment security commission a letter reading, in part, as follows:

*"Gentlemen:* Please find attached list of employees and their social security number who are not entitled to vacations during the period July 2 to July 6. If any other employees are hired between now and the above-mentioned period will advise you so you can make proper notations on their files as they will not be eligible for vacation."

(The name of Helen Vaughan, one of the claimants herein, was listed thereon and it is stipulated by the parties that the pertinent facts with respect to Helen Vaughan "are identical with the facts in regard to Mrs. Bretes" and other claimants.) Thus the claimants, who were "not entitled to vacations" and not "eligible for vacation," obviously were unaffected by the additional provision of article 5, that "All vacations shall be taken during the week in which July 4th shall fall." It was, moreover, further provided in article 5 that they would not receive vacation pay: "It is understood and agreed that any employee who has not worked during the entire 12 months preceding July 1st, shall not be entitled to any vacation pay."

Not being entitled, then, to either a vacation or vacation pay, I cannot accept the analysis that this case, as appellee puts it, "is really the same as if an employee had signed an individual employment contract which contained a provision that the employee would take a vacation during the first week of July each year, without pay for the first year, but with pay thereafter." There was no such provision, there was no such understanding on the part of the employer, and it has been abundantly clear from the date of the referee's hearing to the present that the

claimants have protested such an interpretation of the contract. In the words of Judge Crumpacker of the appellate court of Indiana in *American Bridge Co.* v. *Review Board of the Indiana Employment Security Division,* 121 Ind App 576, 586 (98 NE2d 193, 197) :

"It is difficult to understand why they should be considered as voluntarily on vacation without pay because of a contract which makes no provision for such vacations and the undisputed evidence discloses that they are off work against their will."

The legal situation with respect to contracted-for "vacations" requires clarification. We have here the interpretation of a great remedial statute designed, in its own words, to combat "a serious menace to the health, morals, and welfare of the people of this State." (CL 1948, § 421.2 [Stat Ann 1950 Rev § 17.502].) As such it is to be construed with a liberality consonant with its objectives. The fact that the word "vacation" has been used to justify what claimants insist was an involuntary layoff settles nothing. We must go deeper in our analysis, beyond what Cardozo described as "the tyranny of tags and tickets," and behind the facade of labels. "The repetition of a catchword can hold analysis in fetters for 50 years or more." Cardozo, Mr. Justice Holmes, 44 Harv LR 682, 688, 689.

There is much authority in this field. Many cases, as Justice CARR points out, hold that in this general situation the employee is on a voluntary vacation and, hence, not entitled to unemployment compensation, while others hold squarely the opposite, that the employee is involuntarily unemployed, is, in effect, in a layoff status, and is entitled to compensation. Many of these cases, although reaching contrary results, are perfectly consistent in theory. As a matter of fact, careful courts in certain of the

States (*e.g.* Pennsylvania) have held both ways. They correctly regard their decisions as consistent, not conflicting. The fact of the matter is that we have in this field 2 general types of situations, each having contractual sanction: First, those in which an employer orders a shutdown for his own benefit, and at his own option, for inventory, retooling, in accordance with usual custom, or other matter of his own choice. In this situation, since there is to be a shutdown anyway, why not have the vacations taken then, also? And so it is frequently provided in these company-union contracts that employees entitled to vacations are required to take them during this period. Those, however, who are not entitled to vacations are in a layoff status during this week, as, in the instant case, the employer's letter to the commission, quoted *supra,* clearly indicates. At this point we would do well to reread the contract before us. It is manifest that there is nothing in it which could give rise, even as a matter of inference, to the conclusion that those employees who were "not entitled to vacations" were to go payless simply because those entitled to vacations must take them during the shutdown period. We should exercise the utmost caution in reading into any contract an implication that a rational human being has agreed to do without any of those things he must have for a normal existence, work with pay, food or shelter. If he expressly so agrees we may be justified in viewing him with wonder, not to say alarm. If we so agree for him, by "implying" such an agreement when the express words are lacking, both wonder and alarm may well remain, but for us, not for him.

As an example of the judicial treatment of a contract wherein the company closes for its own purposes, the contract providing, also, that earned vacations shall be taken during this period, we may refer to *American Bridge Co.* v. *Review Board of the*

*Indiana Employment Security Division, supra.* Here the contract reserved to the company the right of a temporary shutdown between certain dates which, the contract said, "may be designated as comprising the vacation period for any employees of the department who are eligible for vacations." In such case, as in the case at bar, the company clearly recognized that not all its employees were eligible for vacations. The company ordered a temporary shutdown for the purposes of inventory, and, in accordance with its contract, also provided that "insofar as possible, this period will be designated for vacations." We have here the typical closing for the company's own purposes with the superadded requirement that this shall be the vacation period. In holding that employees not eligible for vacation were entitled to compensation the court held, in part, as follows (pp 581, 582):

"One of the express purposes of the Indiana employment security act* is to provide for employees who are unemployed through no fault of their own. There is nothing within the provisions of the union contract which would give rise, even inferentially, to a reasonable construction that employees who were not eligible for vacations were affected in any way by the designation of the vacation period for eligible employees. Certainly, the employees who were not eligible for vacation have not by any reasonable interpretation to be placed upon the terms of section 11 (c) 2 of the bargaining agreement consented to any action by the company which would permit the designation of a period of vacation without pay for them. The agreement specifically says that such period of shutdown may be designated as comprising the vacation period for the employees of the department *who are eligible* for vacation."

---

* Burns, Indiana Stat Ann 1951 Replacement, ch 15, § 52–1525 *et seq.*, as amended.—REPORTER.

See, also, *Schettino* v. *Administrator, Unemployment Compensation Act,* 138 Conn 253 (83 A2d 217).

It is in the *Golubski Unemployment Compensation Case,* 171 Pa Super 634 (91 A2d 315, 30 ALR2d 362), that the distinction between the 2 fact situations above noted is most clearly emphasized. In this case the contract reserved to the company the right to a shutdown, which shutdown period, it was provided, might "be designated as * * * the vacation period for any employees * * * who are *eligible for vacation.*" (Italics in the original, p 636.) (We note, in passing, the similarity to the company's language in the case at bar, "they will not be eligible for vacations.") In allowing compensation the Pennsylvania court referred to the earlier *Mattey Unemployment Compensation Case,* 164 Pa Super 36 (63 A2d 429), which had denied compensation, as "clearly distinguishable" and held, as to the case then before it, that (p 638):

"In the instant case the claimants never agreed that they should be laid off for 2 weeks, and it was wholly the employer's option whether or not the shutdown occurred. If it did occur the men agreed only to apply their paid vacation to the 2 weeks shutdown. The employees were available for work and their failure to work was because the employer furnished no work."

In contrast to this situation we have the second above mentioned, that in which a plant-wide shutdown is agreed upon between employer and union for the purpose of granting vacations to all alike, whether paid or payless. Such was the case in *Jackson* v. *Minneapolis-Honeywell Regulator Co.,* 234 Minn 52 (47 NW2d 449), in which the contract provided: "*All employees* shall take time off equal to the established length of the vacation shutdown, except those employees the company may require to work during the vacation shutdown". (Italics in the

original, p 54) ; *In re Employees of Buffelen Lumber & Manfg. Co.,* 32 Wash2d 205, 207 (201.P2d 194), in which the union negotiated "a supplemental agreement, relating to vacations," which provided, in part, that "It is understood that vacations may be given by closing down the entire plant;" *Philco Corporation* v. *Unemployment Compensation Board of Review,* 175 Pa Super 402, 405 (105 A2d 176), in which the contract provided that the company might, "at its discretion, shut down its plant for a vacation period," the court holding (p 409), as in *Mattey, supra,* that the shutdown was for the benefit of the employees, rather than the employer. Similar was the situation in *Beaman* v. *Bench,* 75 Ariz 345 (256 P2d 721), in which, with respect to bargained-for vacations (p 348), the "union representative advised that he was cognizant that the plant might have to shut down for a 2-week period" in order to grant the union's proposal as to the scheduling of vacations. The court held (p 349) that the "appellee and the claimants he represents must be deemed to have agreed to any shutdown compelled by the company's contractual obligation to grant leaves at a specified time."

The difference, in short, between the 2 situations is the difference between shutdowns ordered in accordance with company policy and practice for its convenience and benefit (whether or not it is added that employees who are entitled to vacations must take them during this period), and those shutdowns for the benefit of employees ordered in compliance with the vacation-terms of the contract.

We would not, in our discussion of the second category of agreements, those in which the bargaining representative has agreed to a vacation shutdown, be taken as expressing either our approval or condemnation of a contract in which payless "vacations" are provided for certain employees. That

case is not before us and our decision thereon will await its arrival. For purposes of clarity, however, it should be observed that, should such an agreement be found, questions of the most serious import as to its legality arise, in view of our statutory provision (either not present or not commented upon in many of the cases cited, *supra*) that:

"No agreement by an individual to waive, release, or commute his rights to benefits or any other rights under this act from an employer shall be valid." CL 1948, § 421.31 (Stat Ann 1950 Rev § 17.533).

This statutory prohibition cannot be answered simply by saying that "there may not be a waiver as to a right that does not exist." Of course not. But such reasoning is circular. The very question we are trying to answer is whether or not the right to unemployment compensation exists. Likewise we answer nothing, by saying that an agreement providing for 2 weeks' "leave" (presumably without pay) is not an agreement to waive benefits. How about an agreement providing for a 2 weeks' "layoff"? Six months? Is it good if we call it leave, but bad if we call it layoff? Is this the 16th century, where the word was the talisman? Or must we, in truth, go beyond the words used and find out whether the employee did in fact leave his work voluntarily "without good cause attributable to the employer or the employing unit"?

This latter phraseology (taken from the section of the act imposing disqualification for benefits [CL 1948, § 421.29] (Stat Ann 1950 Rev § 17.531)) does not obtain in all jurisdictions. In many, including certain of those having decisions relied upon by Mr. Justice Carr, the statutes speak merely of those who "voluntarily" leave their employment. The difference between the 2 types of statutes is significant and is well pointed out by the court in *Schettino* v.

*Administrator, Unemployment Compensation Act,*
*supra,* in the following terms (pp 257, 258):

"It (the company) points to the authority of *Jackson* v. *Minneapolis-Honeywell Regulator Co.,* 234 Minn 52 (47 NW2d 449, 451). This case appears to have been decided upon the authority of cases arising under the Washington, Pennsylvania, West Virginia and Massachusetts statutes. (*In re Employees of Buffelen Lumber & Manfg. Co.,* 32 Wash2d 205, 211, [201 P2d 194]; *Mattey Unemployment Compensation Case,* 164 Pa Super 36, 39 [63 A2d 429]; *Paden City Pottery Co.* v. *Board of Review,* 8 CCH Unemployment Ins Rep, W Va, ¶8090; *Moen* v. *Director of Division of Employment Security,* 324 Mass 246 [85 NE2d 779, 8 ALR2d 429]; see, also, *Matter of Rakowski,* 276 App Div 625 [97 NYS2d 309].) These statutes, in terms, disqualify plaintiffs who 'voluntarily' leave their employment. (Minn Stat § 268.09 [Henderson 1949]; Wash Rev Stat Ann § 9998-211 [Supp 1945]; Pa Stat Ann, title 43, § 802 [Supp 1950]; W Va Code Ann § 2366 [78] [1] [1949]; Mass Ann Laws, ch 151 A, § 25 [e] [1] [1949]; NY Lab Law § 593 [1].) The difference in the wording of these statutes from that of our own (Conn 1949 Rev § 7508 [2] [a] necessarily affects the reasoning in those opinions. The test of 'voluntarily' leaving therein discussed and applied is not the test applied in this State.

"Our rule is that 'one is not debarred from compensation because he has voluntarily left his employment unless the administrator shall be of the opinion that it was "without sufficient cause connected with his employment." ' "

Likewise, in this jurisdiction, the disqualification for a voluntary quit does not stand without qualification. It is further provided (CLS 1952, § 421.29 [Stat Ann 1951 Cum Supp § 17.531]), that the quit must be "without good cause attributable to the employer or employing unit." Even though, then, the hurdle of the statutory prohibition against wai-

ver is cleared, the result with respect to a contract allegedly authorizing a payless vacation is still far from obvious. Not only must we find a "voluntary" leaving but it must be without good cause attributable to the employer. If the cessation of work was, as here, the result of company policy of long standing, for its own purposes, and not as a result of personal reasons of the employee expressed either individually or through his bargaining agent, the "cause" would seem clearly attributable to the employer.

The short of the matter is that Mary Bretes, and the other claimants, were here unemployed because the employer, in accordance with his long-standing custom and for his own purposes and convenience, closed his plant during the week of July 4th. She was not entitled to vacation, not eligible for vacation, and not paid for vacation. She did not leave her work "voluntarily without good cause attributable to her employer." On the contrary, if in fact it could be said that her leaving was "voluntary," which is doubtful, she had ample cause directly attributable to her employer, namely, she had no work to go to because her employer had closed the plant. Behind all of this we must constantly bear in mind, is a statutory remedy against the real menace of economic insecurity. A period of no work and no pay, to those of our society who look to their paycheck for their weekly bread, is precisely the kind of economic insecurity that this act was intended to cure and it should be so construed.

The judgment of the circuit court should be reversed. No costs, a public question.

EDWARDS and BLACK, JJ., concurred with SMITH, J.