EMPLOYMENT SECURITY COMMISSION *v.*
ALLIED SUPERMARKETS, INC.

1. Unemployment Compensation—Transfer of Business—Rating Accounts.

Parties to a transfer of business may provide by contract between themselves for possible contingencies, but they may not, by a contractual expression of the opinion of the transfer, deprive the State employment security commission of its statutory right to determine if a transfer of business has occurred which might necessitate adjustment of the employment rating accounts to reflect their current employment situations (CLS 1961, § 421.22).

2. Same—Transfer of Business—Rating Accounts.

The proper burden of contributions made by employers who transfer their businesses pursuant to the employment security act and the resultant recomputation of the employment rating accounts should fall on the employer who affects unemployment in the future (CL 1948, § 421.1 *et seq.*).

---

References for Points in Headnotes

[1–6] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds § 11 *et seq.*
[7, 8] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds §§ 46, 49.
[9] 5 Am Jur 2d, Appeal and Error § 1009 *et seq.*

3. SAME—TRANSFER OF DIVISION OF BUSINESS—RATING ACCOUNTS.

Defendant supermarket corporation which operated 126 super-
markets in the State, *held*, to have operated 126 separate busi-
ness units for purposes of the employment security act, since
otherwise defendant could transfer practically all of its chain
store operations without effecting any change in the computa-
tion of its employment rating accounts (CL 1948, § 421.1 *et
seq.*).

4. SAME—TRANSFER OF DIVISION OF BUSINESS—RATING ACCOUNTS.

Chain store employers are not entitled to an inflexible employ-
ment rating account under the employment security act when
they dispose of and acquire stores and employees (CL 1948,
§ 421.1 *et seq.*, as amended).

5. SAME—TRANSFER OF DIVISION OF BUSINESS—RATING ACCOUNTS.

Defendant supermarket corporation, which operated 126 super-
markets in the State and which sold 3 of its supermarkets,
*held*, to have transferred a business within the meaning of the
section of the employment security act which provides for an
adjustment in defendant's employment rating account upon
transfer of a business, where 90% of defendant's employees
were immediately employed by the buyer with the intent of
permanently leaving the employment of the defendant seller
(CLS 1961, § 421.22[a] [2]).

6. SAME—TRANSFER OF DIVISION OF BUSINESS—RATING ACCOUNTS.

Defendant supermarket corporation, which operated 126 super-
markets in the State, and which sold 3 of its supermarkets ac-
counting for approximately 1.5% of its employment rating
account with the employment security commission, *held*, to have
transferred a business within the meaning of the section of the
employment security act providing for an adjustment of its
employment rating account, since the prior employment rating
account, if allowed to remain, would result in inaccuracy and
improper allocation of the burden of contributions, and would
defeat the purposes of the act (CL 1948, § 421.1 *et seq.*, as
amended).

7. SAME—COURT—GREAT WEIGHT OF EVIDENCE.

A decision of the employment security commission appeal board
may be reversed by a circuit court on a question of fact only
if the decision is contrary to the great weight of evidence
(CLS 1961, § 421.38).

8. SAME—COURTS—GREAT WEIGHT OF EVIDENCE.

Circuit court affirmance of employment security commission appeal board decision, which held that defendant supermarket corporation did not transfer a business, *held*, error, where the decision was contrary to the great weight of evidence (CL 1948, § 421.1 *et seq.*, as amended).

9. COSTS—CONSTRUCTION OF STATUTES.

No costs are allowed on appeal in proceeding to determine rating account of purchaser of 3 of defendant's 126 supermarkets involving the construction of the employment security act (CL 1948, § 421.1 *et seq.*, as amended).

Appeal from Ingham; Coash (Louis E.), J. Submitted Division 1 November 7, 1967, at Lansing. (Docket No. 3,427.) Decided April 2, 1968.

Employment Security Commission determined that Allied Supermarkets, Inc., a Delaware corporation, had transferred a portion of its business to Vay Food Products, Inc., a Michigan corporation, and the Commission transferred various items of Allied's rating account to Vay's rating account. Allied appealed, and a referee of the Commission determined that there had not been a transfer. The Commission appealed, and its appeal board affirmed the referee's decision. The Commission appealed to the circuit court. Affirmed. The Commission appeals. Reversed.

*Frank J. Kelley*, Attorney General, and *Robert A. Derengoski*, Solicitor General, and *E. J. Setlock*, Assistant Atorney General, for plaintiffs.

*Honigman, Miller, Schwartz & Cohn* (*John Sklar*, of counsel), for defendant Allied.

FITZGERALD, J. Plaintiff is on appeal to this Court from a decision of the Ingham county circuit court,

affirming the Michigan employment security appeal board which in turn had affirmed the referee, refusing to uphold plaintiff's determination that on September 7, 1963, defendants had engaged in a transfer and continuation of business under CLS 1961, § 421.22 (Stat Ann 1960 Rev § 17.524).

Defendant Allied Supermarkets (hereafter designated Allied) operated and leased 3 Wrigley supermarkets in Bay City, and Vescio's Inc. (Vescio) operated 5 Vescio markets in other areas of Michigan. Defendant Vay Foods, Inc. (Vay) is a corporation, the stock of which is owned by 2 other corporations, 50% of its stock being held by Vescio's and 50% being held by Brampton Corporation, a wholly owned subsidary of Allied. Vay was first formed in 1962 for another venture in the Saginaw area and is not a party to this appeal.

Business was poor for the Wrigley stores in Bay City, so Allied, by bill of sale, sold the furniture, fixtures, and equipment in the 3 stores, along with the beer and wine (and relevant licenses) and most other merchandise to Vay. The remaining merchandise amounted to approximately 10% of the total sold, and as it was Wrigley labeled, it was retained by Allied. Consideration paid was $283,538.97, and a chattel mortgage for the entire amount was executed between Vay, as mortgagor, and Allied, as mortgagee. The leases on the 3 stores were assigned to Vay by Allied, although Allied was not released of its obligation thereunder by the landlord.

The stores were closed by Allied on Saturday evening and reopened by Vay on Wednesday with 90% of the former employees continuing to work under a similar union contract, and with all 3 managers of Allied continuing to be employed by Vay. During the 2-day closing, the Wrigley identities were all removed, fixtures were rearranged, the

stores were cleaned, and newspaper advertisements were published which proclaimed that the 3 stores would soon be reopened as Vescio's supermarkets with "Open House" celebrations.

On these facts, the commission decided that there was a "transfer of Allied's business" from Allied to Vay effected by Allied's transfer of $147,871.32 of its payroll, requiring transfer of $13,700.36 of its rating account balance, plus $3,567.16 representing contributions paid by Allied on the taxable wages of its employees, and $860.60 representing benefits paid to those employees to the Vay rating account.

The relevant portion of the Michigan employment security act on "transfer of business" was found at CLS 1961, § 421.22 (Stat Ann 1960 Rev § 17.524), and is here reproduced in its entirety to clarify the procedures involved in this 1963 transaction:

"Sec. 22. (a) If an employer subject to this act transfers subsequent to June 30, 1954, any of the assets of his business by any means otherwise than in the ordinary course of trade, such transfer shall be deemed a 'transfer of business' for the purposes of this section if the commission determines:

"(1) That the transferee is an employer subject to this act on the transfer date or has become so subject as of the transfer date under section 41(2) of this act or elects to become subject as of the transfer date under section 25 of this act, provided the commission has been notified of the transfer of assets by the transferor or transferee within 30 days after the end of the quarter in which the transfer occurred, and provided the transferee makes such election within 15 days after the mailing of a notice of his right to elect; and

"(2) That the transferee has acquired and used the transferor's trade name or good will, or that the transferee has continued or within 12 months after the transfer resumed all or part of the business of

the transferor either in the same establishment or elsewhere.

"(b) (1) In the case of a transfer of business as defined in subsection (a) of this section, the commission shall assign the transferor's rating account, or a pro rata part thereof, to the transferee. The commission shall make such assignment as of the date on which the business was transferred or as of June 30 of the year in which the business was transferred, whichever date is earlier. The pro rata part of the transferor's rating account to be assigned to the transferee shall be determined on the basis of the percentage relationship (to the nearest $\frac{1}{2}$ of 1%) of the insured payroll for the 4 completed calendar quarters immediately prior to the date of transfer properly allocable to the transferred portion of the business, to the insured payroll for the same period allocable to the entire business of the transferor immediately prior to the date of the transfer.

"(2) When the commission transfers an employer's rating account in whole or in part under this section, it shall also transfer a proportionate share of the amount of the wages (subject to contributions under this act) paid by the transferor and properly allocable to the transferred business; and such transferred account shall be liable to be charged for all benefit payments based on employment in the business or portion thereof transferred."

A few definitions are in order so that the entire procedure under CLS 1961, § 421.22, may be understood. An employer is initially taxed at a base rate of 2.7% on all taxable wages paid to his employees. He then builds up a "rating account" with the commission over a period of time, which is based on the employer's accumulated employment and lay-off experience in terms of contributions paid by him and unemployment benefits paid out. The "rating account" may thus vary significantly from the 2.7% requirement, dependent upon annual recomputation

by the commission. Allied's contribution rate was
0.8% of its total payroll of $10,000,000. Each em-
ployer has a separate rating account and a "balance"
exists in this account, determined by initial balance,
plus credits, minus charges. A favorable balance
is that amount above unemployment benefits charged
against the employer. When a business is sold, the
commission determines whether a transfer of busi-
ness has occurred, and, if so, adjusts and assigns
the transferor's rating account, or a pro rata share
of same, to the transferee based upon the taxable
wages of the transferred employees as noted in the
portion of the act cited above. This is done so that
the employees who stay on to work in a "trans-
ferred" business will continue to have protection in
case of unemployment, and so that the commission
can be certain that a sufficient and proper balance
exists in the transferee's rating account to insure
that the transferee can meet its obligations under
the act. The total amount to be transferred to Vay's
account was over $18,000 according to the plaintiff,
based on a finding that 1.5% of Allied's payroll in
Michigan was in the 3 Bay City stores to the nearest
½%. We are accordingly asked to reverse the deter-
minations of the referee, appeal board, and circuit
court, and order transfer of that amount from
Allied's favorable balance.

The proper interpretation of section 22(a)(2) is
in issue. The pertinent portion reads:

"(2) That the transferee has acquired and used
the transferor's trade name or good will, or *that the
transferee has continued* or within 12 months after
the transfer *resumed* all or part of the business *of
the transferor* either in the same establishment or
elsewhere." (Emphasis supplied.)

There is no contention that Vay has acquired or
used the name or good will of the Wrigley stores.

The question remains: Has Vay continued or resumed part of the business of Allied, thus continuing the capacity of Allied to give employment?

The Michigan courts have decided only one case which may be said to be relevant to the problem we face here in interpreting the language of section 22(a)(2): *Valley Metal Products Company* v. *Employment Security Commission* (1961), 365 Mich 297. The parties to this appeal find something of value in that case to their respective allegations herein. Valley Metal Products Company (Vampco) purchased the window manufacturing portion of the business of Industrial Machine Tool Co., Inc. (Industrial). The commission determined that Vampco acquired 40% of the total payroll of Industrial and accordingly transferred 40% of the Industrial account to the Vampco rating account with the decision being affirmed by the referee, the appeal board, and the circuit court. The referee found that Industrial retained its business of manufacturing tools, while selling all of the window business to Vampco, excluding receivables and license agreements. Industrial assigned to Vampco the window trademark, *i.e.*, the good will of the business. Industrial agreed not to compete in the window business and Vampco assumed the unfilled orders of Industrial. The Supreme Court found this to be a "transfer of business" and determined that the finding of the referee was not against the great weight of the evidence. The issue in the *Valley Metal Case* concerned an imposition of all benefit payments based on employment to the transferee, instead of the transferor, as any result in unemployment experience should not be assessed against the seller who had previously disposed of the business.

However, we are faced here with fewer factors which might show a transfer than was the Court in the *Valley Metal Case*. It must be remembered that the fact that the good will was not transferred in this case was not an issue because of the provisions of section 22(a)(2). Defendant Allied urges this Court to note favorably the written agreement and stipulation signed by Vay and Allied which was made a part of the sale and disclaimed and denied any intention of the parties that this conveyance was a "transfer of business". In their attempt to take every precaution to prevent the commission from making an unfavorable determination, the parties included this agreement in apparent reliance on the language of the Court in the *Valley Metal Case, supra* (pp 305, 306):

"The increased contributions which necessarily must be made in order to meet the benefit payments must of necessity fall upon the transferee, who is presumably operating the business. Neither party could know at the time of the transfer the exact future experience. *The party purchasing may protect itself by contract or by adjustment of the purchase price against such a contingency.*" (Emphasis supplied.)

As a transfer of business is contractual, defendant Allied alleges that this contractual stipulation of the parties must be given effect by the commission, as it is an essential part of the transaction. We do not believe that the Supreme Court intended to permit purchasers to contract out of all obligation to employees under the Michigan employment security act. Between themselves they may well provide for possible contingencies by contract, but they may not deprive the commission of its statutory right to determine if a "transfer of business" has occurred which might necessitate adjustment of the rating

accounts of the employers to reflect their current employment situations by merely expressing their opinion as to the character of their sale.

The essence of the commission's argument is that this is not a *new* business, but that it is a *continuation* of the *old* business of the transferor. Allied alleges that it is not the *transferor's* business (*i.e.,* not a Wrigley store), but that it is a *commencement* of a new business. Semantic problems abound. The facts of a particular case under the Michigan employment security act must be analyzed in the light of the surrounding legislative intent leading to the amendments which created section 22(a)(2). *I. M. Dach Underwear Company* v. *Employment Security Commission* (1956), 347 Mich 465; *Auten* v. *Unemployment Compensation Commission* (1945), 310 Mich 453. The act embodies a declaration of policy at CL 1948, § 421.2 (Stat Ann 1960 Rev § 17.502):

"Sec. 2. Declaration of policy. The legislature acting in the exercise of the police power of the state declares that the public policy of the state is as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is a subject of general interest and concern which requires action by the legislature to prevent its spread and to lighten its burden which so often falls with crushing force upon the unemployed worker and his family, to the detriment of the welfare of the people of this state. Social security requires protection against this hazard of our economic life. Employers should be encouraged to provide stable employment. The systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment by the setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own, thus maintaining purchasing power and limiting the serious social consequences

of relief assistance, is for the public good, and the general welfare of the people of this state."

Society as a whole is the beneficiary of this act, *Nordman* v. *Calhoun* (1952), 332 Mich 460. Although the transferor may suffer a pecuniary loss by transfer of a portion of the rating account to the transferee, it is clear that this particular portion of section 22 is not a punitive measure. The proper burden of contribution and the resultant recomputation of the rating account should fall on the employer (*i.e.,* the transferee) who would affect unemployment in the future.

We cannot agree with the findings of the referee that the only "business" of Allied is the entire operation of 126 supermarkets in the State of Michigan and that a local market in the chain must be considered to be an integral part of the whole and not a singular business for purposes of this act. The logical extension of such reasoning could permit Allied to dispose of practically all of its chain store operations without effecting any change in the computation of its employment rating accounts, although it is clear that the employment situation would be quite different.

Thus, we are asked to consider the unique problems faced by a chain store when it attempts to sell, or to dispose of, or to abandon certain locations. Allied refers us to a quotation in the case of *Evans* v. *Administrator, Unemployment Compensation Act* (1948), 135 Conn 120, 124 (61 A2d 684, 686):

"To make the purchaser of one unit in a chain of stores a successor would be to read into the statute something that is not there."

The statute questioned purported to create liability in a new employer not previously subject to the act upon his acquisition of substantially all the

assets, trade, or business of another employer who was subject to the act. In the present case, Vay Foods was already covered by section 22 and we are concerned here with a transfer of a rating account already in existence and not the imposition of initial liability. Chain store employers under the Michigan act cannot be said to be entitled to an inflexible rating account when they dispose of and acquire stores and employees.

The referee has made only one other interpretation of section 22 regarding chain store operations, in the case of ACF-Wrigley Stores, Inc., liability appeal No. L61-6784-RO decided by an employment security commission referee January 23, 1963, affirmed by appeal board *sub nom.* Wrigley Supermarkets, Division of Allied Supermarkets, Inc., April 29, 1963 (hereafter designated as Lindy). In this case, Wrigley sold its fixtures, equipment, and merchandise to Lindy's #3, a corporation in which Wrigley had no interest. Wrigley closed down their store and Lindy took over, rearranging the merchandise, placing their own signs, and reopening as Lindy's Supermarket. The significant difference from the present case is that all Wrigley employees were retained by Wrigley and dispersed to other Wrigley stores in the area. Also, the lease held by Wrigley was canceled, whereas in the present case the lease was continued by Vescio. The referee in Lindy held that this was not a transfer of business.

The *Valley Metal* and *Lindy Cases, supra,* establish opposite ends of the section 22 spectrum, and the decision to be made here must fall somewhere in between. We believe this to be a "transfer of business" within the intent of the legislature in creating the language of section 22 which must be read with the declaration of policy. The vital factor, in the considered opinion of this Court, is that 90% of the Wrigley employees immediately began work at the

Vescio markets with the intent of permanently leaving the employ of Allied where they had previously established 1.5% of Allied's rating. We do not engage in further definitions of the words "resume" or "continued". The intent of the legislature is clear in providing continuing benefits and stability for employees in the State of Michigan, and we believe that unrealistic and inaccurate rating accounts would be maintained if we were to hold that an employer could dispose of 3 stores and all the employees thereof and retain a rating computed as if these employees were still working for that employer. The fact remains that Allied employees established 1.5% of Allied's rating account, now they are gone, and in the event of the unemployment of these employees in the future, the inaccuracy existing in the ratings of any employers engaging in transactions such as this would defeat the purposes of the act. It is true that the amounts of money in the fund remain constant and sufficient to pay unemployment benefits should the need arise. However, it is important to allocate the burden of contributions properly, considering the location of every employee without breaking the continuity of employee protection.

This Court held in *Industro-Motive Corporation* v. *Wilke* (1967), 6 Mich App 708, interpreting section 38 of this act, CLS 1961, § 421.38 (Stat Ann 1960 Rev § 17.540), as follows:

"But said court may reverse such decision of said appeal board upon a question of fact only if it finds that said decision of the appeal board is contrary to the great weight of the evidence"

and stated that this language means what it says.

Continuing from *Industro-Motive* (pp 711, 712), we, as that panel, are confronted with the fact that:

"Our problem is to determine whether this record supports the circuit court's holding that the decision of the appeal board with respect to defendant being in employment was contrary to the great weight of the evidence."

While the precise question is different, the test is the same, and we cannot support the referee's decision or the appeal board's, both of which were affirmed by the circuit court. The basic position from which we must operate is the one found in the referee's decision:

. "It is noted that Allied is one of the prominent retail food store chains, which operates in various cities within, and outside of, the State of Michigan. It is found that the 'business' of Allied consists of its one, single, total retail food sales operation; and that it is not made up of a group or numerous separate, independent businesses composed of any 1, or 2, or 3, or other small number of stores. It is found that each store is an integral unit of the total chain. It is found that Allied's 'business' includes its reputation and good will, trade name, purchasing power, organization, and management, and its customer trade.

"Although the 3 Bay City stores involved in this case did constitute all of that portion of Allied's business then located in Bay City, said stores nevertheless constituted only a part of. Allied's total business; it is so found.

"However, it is held that the closing down at any time, of any one, or. of several, Allied stores, involving the sale of the assets or any portion thereof located therein, with or without the surrender or abandonment by Allied of such store location, or locations, does not constitute a sale, transfer, or disposition of any portion of the Allied's 'business', in the absence of a clear showing of an intent to continue such part of said business with the aid of the Allied influence, good will, trade name, purchas-

ing power, organization and management, under Allied's well-established reputable business operation in said unit or store, or at some other location."

Such a finding of fact flies in the face of the evidence presented and of the economic facts of life. Indeed, to subscribe to such a holding would be to hold that the only way a transfer might be effected would be to sell all 126 stores in the Allied chain. Surely the business practices and commerce of today are more flexible than this, and a chain store can be only what the name implies, severable units, strong only as the weakest link.

The 3 stores transferred were segregable from Allied's business of operating chain stores and under no stretch of the imagination can it be called an "abandonment" with a "new" business resulting. The brief interruption of 2 business days, the resumption of business in the same location with the same merchandise, equipment, licenses, and an almost intact labor force leads us to the rhetorical question, "If this isn't a transfer, what is?"

The basic finding of fact of the referee is founded upon quicksand, i.e., Allied's business for purposes of section 22 is one large operation, and thus this finding taints the later proceeding. For this reason, and others set forth, we hold that the circuit court erred in its decision affirming the appeal board which, in turn, erred in affirming the referee.

Reversed. No costs.

T. G. KAVANAGH, P. J., and McGREGOR, J., concurred.