BUZZA *v.* UNEMPLOYMENT COMPENSATION COMMISSION.
FAVERO *v.* SAME.

**1.** Unemployment Compensation—Disqualification for Benefits
—Foreman's Strike.

Stoppage of work in department of automobile factory in which
plaintiff applicants for unemployment compensation were em-
ployed *held,* under record presented to have been caused by
labor dispute involved in foremen's strike then in progress,
such foremen being employees in the same establishment as
plaintiffs, hence plaintiffs were disqualified from receiving
unemployment benefits (PA 1936 [Ex Sess], No 1, § 29 [c],
as amended by PA 1943, No 246).

**2.** Same—Slowdown—Sympathetic Labor Dispute—Foremen's
Strike.

Employer which was unable to obtain production or able to
get other employees to do work as welders in place of those
who caused a "slowdown" to 25% or 30% of normal produc-
tion and thereby necessitated layoff of plaintiffs who worked
on automobile bodies after welders had completed their
operations was entitled to lay off employees directly affected
by the slowdown without entitling them to unemployment
benefits, notwithstanding there was no labor dispute direct-
ly between the employer, plaintiffs or the welders, but last
mentioned would not have slowed down their operations by
horseplay, sabotage, and other delaying activities had there
not then been in progress a foremen's strike and consequent
loss of supervision (PA 1936 [Ex Sess], No 1, § 29[c], as
amended by PA 1943, No 246).

**3.** Constitutional Law—Unemployment Benefits—Legislature
—Courts.

Whether or not the unemployment compensation act unduly re-

---

References for Points in Headnotes

[1, 2, 5] 48 Am Jur, Social Security, Unemployment Insurance, and
Retirement Funds, § 36.
[1, 2, 5] Constitution and application of provisions of social secu-
rity or unemployment compensation acts regarding disqualifi-
cation for benefits because of labor disputes or strikes. 135
ALR 920; 148 ALR 1309; 154 ALR 672; 173 ALR 490.
[4] 48 Am Jur, Social Security, Unemployment Insurance, and
Retirement Funds, § 49.

stricts an employee in obtaining unemployment compensation is a matter for legislative determination, as courts have no power or authority to pass upon the wisdom, policy or equity of legislation (PA 1936 [Ex Sess], No 1, § 29, as amended by PA 1943, No 246).

4. Unemployment Compensation—Appeal Board.

Reasoning of appeal board of the unemployment compensation commission is not reviewed where it reached the right result.

5. Same—Disqualification for Benefits—Accumulation of Back-log.

Plaintiff employees who were not recalled to work until a week after foremen's strike was terminated were properly disqualified from receiving unemployment benefits for entire duration of layoff, where it took until such time to accumulate a normal backlog of material upon which plaintiffs could work, such backlog having been dissipated earlier during slow down of workers who preceded plaintiffs in their operations and whose conduct eventually resulted in layoff of themselves and plaintiffs, all of the lack of work being ultimately due to foremen's strike, notwithstanding the preceding workers had been called back to work about 4 weeks before plaintiffs (PA 1936 [Ex Sess], No 1, § 29[c], as amended by PA 1943, No 246, and PA 1947, No 360).

Appeal from Wayne; Murphy (George B.), J. Submitted January 10, 1951. (Docket Nos. 11, 12, Calendar Nos. 44,902, 44,903.) Decided April 3, 1951.

Certiorari by Arthur Buzza and others and Joseph Favero and others to review decision of the Appeal Board of Michigan Unemployment Compensation Commission denying their claim for benefits. Judgment for plaintiff. The employer, Ford Motor Company, appeals. Reversed and remanded.

*Zwerdling & Zwerdling* (*A. L. Zwerdling,* of counsel), for plaintiffs.

*William T. Gossett, Richard A. Fellrath* and *Frederick C. Nash,* for Ford Motor Company.

*Frank G. Millard,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Edward Coughlin,* Assistant Attorney General, for Michigan Unemployment Compensation Commission.

*Amicus Curiae:*

*Beaumont, Smith & Harris* (*Frank E. Cooper,* of counsel), for Michigan Manufacturers' Unemployment Compensation Bureau, Inc.

NORTH, J.   In the 2 above entitled cases certain employees, 1,549 in number, of the Ford Motor Company were held to be disqualified and denied unemployment compensation by the appeal board of the Michigan unemployment compensation commission. One of the 3 members of the board dissented, and agreed with the referee who had held that none of these claimants was disqualified to receive unemployment benefits.   On appeal in the nature of certiorari to the circuit court of Wayne county the holding of the appeal board was reversed, and the claimants were held not to be disqualified.   The Ford Motor Company has appealed from the judgment entered in the circuit court.

At the hearing before the referee the claims of all employees in these suits were consolidated; but the claimants were separated into group 1 consisting of 1,505 claimants, and group 2 consisting of 44 claimants.   The circumstances which gave rise to this litigation are stated in the opinion of the circuit judge, from which we quote:

"The claimants involved in group 1 were employees in the 'B' Building and in supply departments of the Pressed Steel Building of Ford Motor Company.   Claimants involved in group 2 were employees in department 92 of the Pressed Steel Building of Ford Motor Company.

· "A foremen's strike occurred on May·21, 1947 at the· Ford Motor Company in which approximately 4,400 foremen were involved and continued to July 7, 1947.

"During this foremen's strike the hourly-rated employees (approximately 60,000) continued to work even though production in the entire Rouge Plant was reduced to about 75% of normal because of the foremen's strike.

"On June 9, 1947, the production of automobile bodies in the No 1 body bucks in department 92 fell to 25% to 30% of normal production. The recalcitrant employees were warned by management that they would be sent home unless production improved. After 4 hours of work on June 9th, production had not improved and the employees in department 92 were sent home and advised to return to work the next day, provided, they were willing to meet some semblance of production. On June 10, 1947 the employees (the day shift) worked for 7 hours. However, production failed to increase and they were sent home,* even though management had warned the employees and discussed the matter with the union representatives that this would happen unless production increased.

· "June 10, 1947 was Tuesday. The men were working on a 5-day shift. Meanwhile, conferences were had. The men returned to work for good the next Monday, June 16th. They, therefore, lost 3 work days. Henceforth, these buck operators produced about 70% or 75% of normal production.

"There was never any more trouble with them.

"It is not these buck operators that are claimants here. Of the claimants there are 1,546 in number and they are asking for compensation in the approximate amount of $166,000.   *   *   *

· "The Foremen's Association of America, an organization independent of both CIO and A. F. of L., called a strike of the 4,400 foremen in the River

---

* It was shown that the night shift employees maintained satisfactory production.

Rouge Plant of Ford Motor Company in 1947, which lasted from May 21st to July 7th. It is undisputed that the production and maintenance employees and the union (Local 600, UAW-CIO) representing them were in no way involved in the dispute (in the foremen's strike).

"As the appeal board majority stated in their decision, 'During the period involved there was no dispute between Local 600 (UAW-CIO) and the Ford Motor Company regarding wages, hours or working conditions of their members. Members of Local 600 had been instructed by their union to cross the picket lines, which were established by the striking foremen. The union further instructed the men to continue at their jobs, since the issues involved in the foremen's strike and its settlement would not affect the wages, hours and working conditions of the members of Local 600.'

"There was testimony that the absence of the foremen reflected itself in a drop in production levels throughout the plant. They reached about 75% of normal production which apparently was acquiesced in by the plant managers as normal production, under the circumstances, there then being in progress a foremen's strike. During the first part of June there was a considerable drop of production in department 92 of the Pressed Steel Building. There was testimony that during the first 4 hours of work on June 9th production in that department was 25% to 30% of normal level of production. It should have been, under the circumstances, approximately 75%.

"Department 92 welds parts to the Ford and Mercury bodies. The process takes place on a fixture called a 'buck.' There are 6 body bucks.    *    *    * After the welding is done a conveyor takes the body to a shipping dock from which it is hauled to 'B' Building for final assembly. The drop in production which occurred on June 9th is described by employer witnesses as occurring as a result of activities of employees on the #1 buck series in department 92 only. There are 6 of these #1 bucks (only

5 were being operated, as was the usual custom) with approximately 5 men working on each of the 6 bucks, so that the drop in production stemmed from activities, horseplay, sabotage, or inactivity on the part of some of these 25 employees.* After 4 hours had passed on the day shift, June 9th, the company sent over 150 employees in the entire department (92) home with instructions to come back the next day. On June 10th the company again sent home the entire day shift after 7 hours work, when it found that production was not improved. It was testified that on this day, also, the source of the difficulty was some (not all) unidentified individuals among the 25 working on the #1 buck series.

"The company laid off the employees of department 92 of the Pressed Steel Building for 1 week, recalling them on June 16th. The company also laid off for lack of work approximately 1,500 other employees in several other departments of the 'B' Building and in supply departments of the Pressed Steel Building. The explanation for this layoff was that the shutdown of department 92 necessitated their unemployment, because of the relationship between work done in department 92 and their work. These employees (claimants) were not called back on June 16th when the employees in department 92 were recalled, but were recalled on July 14th. The testimony reflects that some of the individuals on the #1 buck series committed acts of misconduct by 'laying down' on the job, horseplay, and sabotage, that would not have occurred but for the absence of the foremen, who were on strike."

---

* In his opinion the referee stated he was "satisfied that certain unidentified employees of this group were deliberately curtailing their production by various methods;" and both he and, in substance, the appeal board stated: "There was some evidence that the lack of production on the day shift in department 92 was, in part, due to the following deliberate actions on the part of the employees: Cutting and breaking hoses, shutting off water lines which resulted in burning the points of the guns, shutting off the conveyor line for 15 minutes without cause, and deliberate breakage of tools, materials and equipment."

Insofar as essential to decision herein, the testimony as to the facts involved supports the foregoing findings or recital of the circuit judge. Evidently as foreshadowing his ultimate conclusion, the circuit judge also said:

"Under its collective bargaining agreement with UAW-CIO the employer had the right to discipline these individuals by discharge, or by disciplinary layoff. It did not choose to do either. For section 29 (1) (a) of the act, had they done this, that is, laid off these men, the 1,500 other individuals, plaintiffs herein, would have been entitled, had the company shut down, to unemployment compensation benefits. The company, so to speak, followed an 'appeasement policy,' with the net result that over 1,500 claimants were involuntarily laid off from June 10th to July 14th and (according to the employer's claim) disqualified for unemployment compensation. Hence this lawsuit."

The pertinent portion of the unemployment compensation act, as it was worded at the time this controversy arose, is embodied in PA 1936 (Ex Sess), No 1, as amended by PA 1943, No 246, particularly section 29,* which in part read:

"Sec. 29. * * * An individual shall be disqualified for benefits:   *   *   *
(c) For any week with respect to which his total or partial unemployment is due to a stoppage of work existing because of a labor dispute in the establishment in which he is or was last employed: *Provided, however,* That no individual shall be disqualified under this section if he shall establish that he is not directly involved in such dispute. For the purpose of this section, no individuals shall be deemed to be directly involved in a labor dispute unless it is established:   *   *   *

---

* For later amendment see CL 1948, § 421.29 (Stat Ann .1950 Rev § 17.531).—REPORTER.

(4) That at any time, there being no labor dispute in the particular establishment or department or unit in which he was then employed, he shall have become unemployed because of a stoppage of work which was directly caused in his particular establishment or department or unit by and solely because of a stoppage of work due to a labor dispute which was then in progress in some other establishment or department or unit of the same employing unit by whom he was then employed."

In appellant's brief the fourth statement of questions involved reads:

"Did the stoppage of work in department 92 exist because of the labor dispute between appellant and its foremen as well as because of the labor dispute between appellant and its No 1 body bucks employees?"

In one of appellant's briefs it is stated:

"Appellant has shown in its brief that the foremen's strike caused the stoppage of work to which the unemployment of these plaintiffs was due and that for this reason, if for no other, plaintiffs should have been disqualified for benefits."

In its decision the appeal board said:

"It is accordingly our finding that the claimants' unemployment was due to a stoppage of work existing because of a labor dispute in the establishment in which they were last employed within the meaning of the provisions of section 29 (c) of the act (being PA 1943, No 246). The decision of the referee is hereby reversed. It is held that the claimants shall be disqualified under the provisions of section 29 (c) of the act from June 9, 1947, and for the duration of their unemployment due to the labor dispute."

It was this holding of the appeal board which was reversed in the circuit court. This appeal followed. Appellant asserts disqualification of plaintiffs for

unemployment benefits both on the ground that the stoppage of work incident to which they were employed was caused by the labor dispute involved in the foremen's strike which at the time was in progress; and by reason of a labor dispute in department 92. We direct our attention to the first of the above contentions. From one of our recent decisions in which we construed the statutory provisions applicable to the instant case, we quote the following:

"When the legislature amended section 29 of the act by adding paragraph (4) to subdivision (c) of that section, it placed in the statute an additional condition under which, if established, an employee would be disqualified for receiving unemployment compensation. * * * In each of these 3 preceding paragraphs the legislature has specified a circumstance or condition which, if 'established,' results in the employee being directly involved in the labor dispute *as a matter of law,* and therefore disqualified for unemployment compensation. In the same subdivision (c) of section 29 and correlated with paragraphs (1), (2) and (3), paragraph (4) was added; and this added paragraph defines a condition of disqualification not embodied in paragraphs (1), (2) or (3), in that such disqualification arises if the employee 'shall have become unemployed because of a stoppage of work which was directly caused in his particular establishment or department or unit by and solely because of a stoppage of work due to a labor dispute which was then in progress in some other establishment or department or unit of the same employing unit by whom he (the employee) was then employed,' even though there was 'no labor dispute in the particular establishment or department or unit in which he was then employed.'" *General Motors Corp.* v. *Unemployment Compensation Commission,* 321 Mich 724.

At the time the unemployment of plaintiffs herein began, June 10, 1947, a foremen's strike in Ford

River Rouge plant, in which plaintiffs were employed, had been in progress from May 21, 1947, and continued to July 7, 1947. Approximately 4,400 Ford foremen were engaged in this strike. With the exception of the general foreman all of the foremen in department 92 joined the strikers. In department 92 there were employed 3 shifts. Of the day shift 25 employees worked as welders on fixtures called "bucks." In the #1 series of these there were 5 bucks, and 5 welders worked on each buck. The work of these men consisted of welding together the major parts of the bodies of the automobiles being manufactured. After their part of the process was accomplished, and the floor panels fastened to the side panels on another series of bucks, the automobile bodies were taken by a conveyor to a loading dock, and from there they were transported about 1,000 yards to the B building where the next labor incident to finishing the bodies was carried on by other employees including upwards of 1,500 of the plaintiffs. Obviously if the welders on the day shift did not perform their part of manufacturing the automobile bodies, these bodies could not be forwarded for subsequent work to the employees in B building. The work of these welders was at such a point in the line of production in the Ford plant that in the testimony it is termed a "bottleneck." Further, the failure of the men who worked on the #1 series of bucks to do the welding on the automobile bodies would also cause a cessation of employment for the employees who in department 92 furnished the parts to the welders as needed.

After the inception of the foremen's strike, and beginning about June 1, 1947, there was a falling off in the rate that the welders on the day shift in department 92 did their work on the auto bodies. This "slowdown" gradually increased until by June 9th and June 10th production by the day shift welders

had fallen to approximately 30% of the normal production. That this slowdown resulted from a sympathetic attitude of the day shift welders in department 92 toward the striking foremen clearly appears from the record. Their regular foreman had joined in the foremen's strike. The general foreman, who did not join the strikers, attempted to take the place of the welders' regular foreman. These welders took such a hostile attitude toward this general foreman, because of his not having joined the other foremen in the strike, that he had to be replaced by others who attempted to supervise the work of these welders in department 92. There was objection to the company's decision to provide other supervision in an effort to maintain production in that department. When the company's labor relations department representative asked of these welders why they were not producing, the response was: "Get the scab foremen out of here and we'll work better," and "We're not going to work for any scab foremen." The general foreman was charged by these welders, or some of them, with being a "scab," and he was told that if he desired normal production, to do the work himself or go out on the strike with the rest of the foremen. While this general foreman was not at any time during the foremen's strike threatened by production workers with physical harm, when he was on his way to work on the morning of June 9th he was accosted by 7 men and told that if he valued his home and health and car he better not go to work. In consequence he did not return to work until June 16th when the employees in department 92 were recalled. The welders who were parties to this slowdown made it plain to the employer's representative that they were not going to work for anyone but their own foreman. One of these welders, when urged by a supervisor to work at his normal rate, said: "Until my regular foreman (who was on a strike with the

other foremen) comes back, why, this is it." They placed placards on conveyors threatening physical harm to the so-called scab foreman. In connection with such use of these placards there was testimony that the flying squadron of the Foremen's Association was definitely "involved with the workers on the job (of welding) at the time." The participants in the slowdown in department 92 loafed, played dice games, read newspapers, and spent excessive time in the washroom. They misused tools in such a way as to cause them to be unusable. As a result of the welders' co-operation with the striking foremen and their refusal to render service in the usual and normal way, there was a stoppage of work not only for the entire day shift in department 92, but also in other departments in the Pressed Steel building, where the welding was done, and in B building, to which the bodies were to be transported after the welders had completed their work, for further work to be done thereon by upwards of 1,500 of the employee plaintiffs.

Under the record before us we deem the conclusion inescapable that the slowdown of the day shift welders in department 92, regardless of whether all or only part of the 25 participated, was nothing more or less than a method of expressing sympathy and co-operation of these welders with the then striking foremen. In practical effect these welders on #1 bucks joined the foremen's strike. The slowdown effected by these welders was plainly an effort to aid the foremen in their strike by stalling production in the Ford plant. When this was accomplished, obviously there was a stoppage of work for other employees in the Pressed Steel building and in B building, and thereupon the employer laid off not only the welders who participated in the slowdown, but also the other employees who are plaintiffs herein.

In view of the purpose which prompted the day shift welders in department 92 to accomplish by their misconduct a slowdown, the conclusion is not only justified, but quite inescapable, that the cause of plaintiffs' unemployment resulted from the strike of the foremen who were employees in the same establishment as plaintiffs herein. As noted above, in his opinion the circuit judge said: "The testimony reflects that some of the individuals on the #1 buck series committed acts of misconduct by 'laying down' on the job, horseplay, and sabotage, that would not have occurred but for the absence of the foremen, who were on strike." The unemployment of plaintiff employees clearly was caused by and solely because of the labor dispute involved in the foremen's strike. This conclusion is necessitated because it appears beyond doubt that had there been no foremen's strike there would have been no slowdown in department 92, and the plaintiffs herein would not have been laid off because of the resulting work stoppage. And also, it may be noted that plaintiff employees in their brief herein take the position that:

"A 'labor dispute' did not occur here (in department 92), within the proper definition of that phrase as used in section 29 of the unemployment compensation act. * * * By no stretch of the imagination can these isolated actions by a few be cloaked in the all-embracing mantle of the labor dispute disqualification."

We conclude that the stoppage of work in consequence of which plaintiffs were laid off was caused by the labor dispute involved in the foremen's strike then in progress. Under section 29, subd (c), par (4), plaintiffs herein were disqualified from receiving unemployment benefits.

In reaching our conclusion we are mindful of plaintiffs' contention that instead of pursuing the

course taken by the employer in this case, the recalcitrant day shift welders in department 92 might have been discharged or given a disciplinary layoff. But there was objection to the employer's effort to provide other supervisors in department 92 in order to obtain production; and no showing was made in this case that the employer was able to get others of its employees who would and could take the place of the day shift welders in the Ford plant, all of whom, except the foremen, were members of the same union as these welders. We think the employer acted within its rights.

In consequence of the factual aspect of this case, the contention is made in behalf of plaintiffs that they became unemployed through no fault of their own, and therefore they should not be deemed to be disqualified. The answer to such contention is contained in our former decision in *General Motors Corp. v. Unemployment Compensation Commission, supra,* wherein a headnote reads:

"Whether or not amendment [par (4) of § 29 (c)] of unemployment compensation act unduly restricted employee in obtaining unemployment compensation is a matter for legislative determination, as courts have no power or authority to pass upon the wisdom, policy or equity of legislation (PA 1936 [Ex Sess], No 1, § 29, subd [c], par 4, as added by PA 1943, No 246)."

While in reaching its decision the appeal board did not review or base its conclusion on the ground herein adopted, we hold that the appeal board, in concluding plaintiffs were disqualified, reached the right result. In consequence we deem it unnecessary to review the reasoning which led the appeal board to its conclusion.

It appears from the record that the employees in department 92 were recalled to work June 16, 1947;

but the other plaintiff employees, who had been laid off on June 10th, were not recalled until July 14th, which was 1 week after termination of the foremen's strike. In the attorney general's brief, submitted in behalf of the unemployment compensation commission, it is contended that as to these claimants who were not recalled on June 16th, their disqualification should be held not to have extended after that date. The reason urged in support of this claim is that if there was a labor dispute in department 92 which caused the stoppage of work, that labor dispute terminated June 16th, when the employees in department 92 resumed work. Hence it is argued that the employees who were not recalled until July 14th should not be held disqualified from June 16th to July 14th. Normal production in the departments here involved was not restored prior to July 14th. And since, as we have held, the cause of stoppage of plaintiffs' work was the foremen's strike which at the time was in progress and did not end until July 7th, the contention that the disqualification of these employees ended June 16th is not tenable or applicable. And, in our opinion, the record discloses sufficient reason and justification for not recalling these employees until 1 week after termination of the foremen's strike. Such is the case because in the normal conduct of manufacturing its automobiles the employer maintained as a "float" or safety backlog approximately 1,800 of these automobile bodies on which the welders in department 92 had completed their work; but during the slowdown this backlog of bodies had been entirely used up by the B building employees in doing their work. It quite reasonably appears that the employees who were not recalled June 16th could not advantageously have been returned to work until the beginning of the next week after the foremen's strike ended. In the meantime the aftermath of the slowdown and the needed back-

log of automobile bodies could be readjusted. The undisputed testimony is it was not until Friday next preceding the Monday, July 14th, on which the employees in B building were recalled that, particularly as to Mercury cars, the employer "had enough on the system to start it up again."

While we deem it unnecessary, it may be noted that PA 1947, No 360 (CL 1948, § 421.29 [Stat Ann 1949 Cum Supp § 17.531]), became effective July 8th, the next day after the foremen's strike ended. Hence it seems that the law as amended, effective July 8th, would be applicable to any claim in this case for unemployment compensation from July 8 to July 14, 1947, inclusive. As amended in 1947, section 29, subd (b), par (4), provides that under such circumstances as are involved in the instant case an employee would be disqualified to receive unemployment benefits if the stoppage of work was "due to a labor dispute *which was* or is in progress in some other department or unit or among a different grade or class of workers of the same employing unit by whom he was then employed." Therefore, notwithstanding the foremen's strike ended July 7, 1947, plaintiffs' disqualification would still continue from July 8 to July 14, 1947.

The circuit judge was in error in holding plaintiffs were entitled to unemployment benefits. On the contrary we conclude that unemployment compensation should be denied, as was held by the appeal board. The judgment of the circuit court is reversed and the case remanded to the circuit court for entry of judgment in accordance herewith and remand of the case to the unemployment compensation commission.

REID, C. J., and BOYLES, DETHMERS, BUTZEL, CARR, BUSHNELL, and SHARPE, JJ., concurred.