DOERR v UNIVERSAL ENGINEERING DIVISION, HOUDAILLE
INDUSTRIES, INC

Docket No. 78-389. Submitted February 8, 1979, at Lansing.—Decided
June 5, 1979. Leave to appeal applied for.

Plaintiffs, Carl Doerr and others, were employees of Universal
Engineering Division, Houdaille Industries, Inc., in 1971. Plain-
tiffs were represented for collective bargaining purposes by the
United Auto Workers Union. The UAW and the employer were
bound by a collective bargaining agreement which had an
expiration date of June 1, 1971.

On April 1, 1971, the employer gave notice of its intent to
terminate the agreement at its expiration. A series of meetings
between the UAW representatives and representatives of the
company were held. During negotiations the union expressed a
desire to continue working under the terms of the agreement
beyond the date of expiration. The union, however, gave some
indication that such continuation of work should be contingent
on making any new agreement retroactive to the expiration
date of the old contract.

On May 31, 1971, when an agreement had not been reached,
the company carried out its earlier announced plan to lock out

REFERENCES FOR POINTS IN HEADNOTES
[1, 3, 10, 11, 13-15] 76 Am Jur 2d, Unemployment Compensation
§§ 79, 81.
Unemployment compensation: application of labor dispute disquali-
fication for benefits to locked out employee. 62 ALR3d 437.
General principles pertaining to statutory disqualification for
unemployment compensation benefits because of strike or labor
dispute. 63 ALR3d 88.
[2, 14] 76 Am Jur 2d, Unemployment Compensation § 78.
[3, 15] 76 Am Jur 2d, Unemployment Compensation § 77.
[4, 13] 76 Am Jur 2d, Unemployment Compensation §§ 93, 94.
[5, 7] 16 Am Jur 2d, Constitutional Law §§ 531, 532.
13 Am Jur 2d, Statutes § 41.
[6, 8] 16 Am Jur 2d, Constitutional Law §§ 494, 498.
[8, 14] 16 Am Jur 2d, Constitutional Law § 172.
[9, 12] 76 Am Jur 2d, Unemployment Compensation § 5.
[10] 76 Am Jur 2d, Unemployment Compensation § 11.
[12] 76 Am Jur 2d, Unemployment Compensation § 6.

the employees. Two weeks later negotiations were resumed. The lockout was terminated on August 23, 1971. A new contract was signed and ratified on January 13, 1972. By its terms it was effective December 27, 1971.

During the lockout, the employees applied for unemployment compensation benefits. The multi-claimant benefit section of the Employment Security Commission determined that the unemployment was due to a "labor dispute in active progress" and that the employees did not qualify to receive benefits. This finding was affirmed by a hearing referee at an evidentiary hearing and by the Employment Security Appeal Board. The employees appealed to the Genesee Circuit Court, which upheld the Board's determination that the unemployment was due to a "labor dispute in active progress", but found that the applicable section of the Employment Security Act was unconstitutional in that it deprived the employees of equal protection under the law. The circuit court, Philip C. Elliott, J., on rehearing, reversed itself on the constitutional question and ruled that the employees were not entitled to benefits. The plaintiffs appeal alleging 1) that the finding that plaintiffs were unemployed due to a labor dispute in active progress is not supported by the evidence, 2) that the statutory provision under which the plaintiffs were disqualified from receiving benefits violates the equal protection clause of both the United States and Michigan Constitutions, and 3) that the Federal labor laws under the National Labor Relations Act preempt the rights of a state to disqualify employees affected by a labor dispute from receiving unemployment compensation benefits. *Held:*

1. The record indicates that the lockout was prompted almost entirely by economic factors. The Board's determination that the unemployment of the plaintiffs was due to a "labor dispute in active progress" was not supported by competent, material and substantial evidence. The union continually expressed its willingness to work without a contract and the assertion that the new contract should be made retroactive to the expiration date of the old contract was not a demand conditioning the union's offer to work without a contract. In reality the lockout was a disguised layoff and was not the result of a labor dispute. The plaintiffs are entitled to benefits.

2. That portion of the Employment Security Act which disqualifies from receiving benefits one who is unemployed due to a labor dispute in active progress is not violative of the equal protection clause of the Michigan Constitution or of the Federal Constitution. There is a rational basis for the classification made by the disqualification provision.

3. Federal labor law under the National Labor Relations Act

has not preempted the legislative scheme found in the disqualification provision of the Employment Security Act.

Reversed in part and affirmed in part.

R. M. MAHER, J., concurred. He agrees that the unemployment was not due to the labor dispute and that the employees are not disqualified from receiving unemployment benefits.

BASHARA, P.J., dissents in part. He would hold that there was sufficient evidence presented to support the Appeal Board's decision that the efficient cause of the plaintiffs' unemployment was a labor dispute in active progress and that the plaintiffs were not qualified to receive unemployment compensation benefits. He agrees that there is no equal protection violation and that the National Labor Relations Act has not preempted the state from legislating in this area.

He would affirm the trial court.

### OPINION OF BRENNAN, J.

1. UNEMPLOYMENT COMPENSATION — EMPLOYMENT SECURITY COMMISSION — APPEAL BOARD — FINDINGS OF FACT — LABOR DISPUTE — BENEFITS — LOCKOUT.

A finding of the Employment Security Appeal Board that certain locked-out employees were unemployed as a result of a labor dispute in active progress and that, therefore, the employees were not entitled to unemployment compensation benefits was not supported by competent, material and substantial evidence where a review of the record indicates that the lockout was prompted almost entirely by economic factors and was really a disguised layoff.

### DISSENT BY BASHARA, P.J.

2. UNEMPLOYMENT COMPENSATION — LABOR DISPUTE — WORDS AND PHRASES — STATUTES.

*A "labor dispute" for purposes of the Employment Security Act is a controversy between an employer and its employees regarding such matters as hours, wages and conditions of employment.*

3. UNEMPLOYMENT COMPENSATION — LOCKOUT — LABOR DISPUTE — CAUSE-IN-FACT TEST.

*A "cause-in-fact" test is to be applied to determine whether claimants for unemployment compensation, who have been locked out by their employer, are unemployed due to a labor dispute in active progress or for some other reason; the application of this test is to ask whether claimants would have been unemployed despite the labor dispute.*

4. UNEMPLOYMENT COMPENSATION — APPEAL BOARD — FINDINGS OF FACT — EVIDENTIARY SUPPORT — CONSTITUTIONAL LAW — STATUTES.

*Findings of the Unemployment Compensation Appeal Board must be left undisturbed as long as they are supported by competent, material and substantial evidence on the whole record (Const 1963, art 6, § 28; MCL 421.38[1]; MSA 17.540[1]).*

5. CONSTITUTIONAL LAW — STATUTES — EQUAL PROTECTION — RATIONAL RELATION TO LEGITIMATE STATE INTEREST.

The test of the constitutionality of a statute, in face of an equal protection challenge, where the statute does not involve any discernible fundamental interest or affect with particularity any protected class, is whether the statute has a rational relation to a legitimate state interest.

6. CONSTITUTIONAL LAW — EQUAL PROTECTION — RATIONAL BASIS TEST.

An equal protection inquiry under the rational basis standard employs a relatively relaxed standard reflecting an awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one and that perfection in making the necessary classifications is neither possible nor necessary.

7. CONSTITUTIONAL LAW — EQUAL PROTECTION — STATE CONSTITUTION — FEDERAL CONSTITUTION.

The equal protection clause of the Michigan Constitution affords the same rights as the equal protection clause in the Federal Constitution.

8. CONSTITUTIONAL LAW — STATUTES — EQUAL PROTECTION.

The burden is on a party who challenges, on equal protection grounds, legislation dealing with property rights, not fundamental rights, to show that the classification is arbitrary and does not bear a rational relation to the object of the legislation.

9. EMPLOYMENT COMPENSATION — INVOLUNTARY UNEMPLOYMENT — LABOR DISPUTES — NEUTRALITY OF STATE — EQUAL PROTECTION — STATUTES.

Two purposes behind the Employment Security Act are (1) to provide interim unemployment benefits for those who suddenly find themselves unemployed through no fault of their own and (2) to insure that the state remains neutral in labor disputes; a provision in the act which excludes from the coverage of the

act those who are unemployed due to a labor dispute in active progress has a rational basis and is not violative of equal protection (MCL 421.2, 421.29[8]; MSA 17.502, 17.531[8]).

10. UNEMPLOYMENT COMPENSATION — STATUTES — PREEMPTION — LABOR DISPUTES — DISQUALIFICATION FROM BENEFITS — FEDERAL LAW.

Federal labor law under the National Labor Relations Act has not preempted the rights of states to disqualify employees affected by a labor dispute from receiving unemployment compensation benefits.

OPINION BY MAHER, J.

11. UNEMPLOYMENT COMPENSATION — EMPLOYMENT SECURITY ACT — DISQUALIFICATION FROM BENEFITS — LABOR DISPUTE — STATUTES.

*A provision in the Michigan Employment Security Act which disqualifies from benefits those who are unemployed as a result of a labor dispute in active progress was not intended to disqualify from benefits, regardless of circumstances, those who are unemployed as a result of unilateral action taken by their employer (MCL 421.29[8]; MSA 17.531[8]).*

12. UNEMPLOYMENT COMPENSATION — MICHIGAN EMPLOYMENT SECURITY ACT — INTENT — CONSTRUCTION — STATUTES.

*The Michigan Employment Security Act is intended to provide relief from the hardships caused by involuntary unemployment; the act, being remedial, must be construed liberally to achieve its purpose, and conversely, the disqualification provisions are to be read narrowly (MCL 421.1 et seq.; MSA 17.501 et seq.).*

13. UNEMPLOYMENT SECURITY — COURT OF APPEALS — EMPLOYMENT SECURITY ACT — APPEAL AND ERROR.

*It is the responsibility of the Court of Appeals, when reviewing cases arising out of labor-management disputes and which involve the Michigan Employment Security Act, to assure that the purpose of the Employment Security Act is fulfilled without compromising the neutrality of the State of Michigan toward labor-management controversies; just as unemployment compensation benefits may not be used to support employees during a strike, so too, denial of benefits may not be used to strengthen the position of an employer who has locked out employees who are willing to work (MCL 421.1 et seq.; MSA 17.501 et seq.).*

14. Unemployment Compensation — Employment Security Act —
    Employer's Exemption — Labor Dispute.

> *An employer who seeks exemption from payment of unemployment benefits under the Employment Security Act on the ground that the claimants' unemployment was caused by a labor dispute in active progress bears the burden of proving that he is entitled to that exemption; the mere fact that negotiations for a labor contract are underway does not automatically bring a lockout within the labor dispute exception (MCL 421.29[8]; MSA 17.531[8]).*

15. Unemployment Compensation — Employment Security Act —
    Disqualification — Labor Dispute — Lockout — Statutes.

> *The provision of the Employment Security Act which disqualifies an employee from receiving unemployment compensation benefits if the unemployment is due to "a labor dispute in active progress" includes only unemployment resulting from labor disputes in which the employee himself actively engages by refusing to work; the act was not intended to enforce a lockout by an employer by denying unemployment compensation benefits to employees who are available for work, but who are denied work by their employer (MCL 421.29[8]; MSA 17.531[8]).*

*Marston, Sachs, Nunn, Kates, Kadushin & O'Hare, P.C.* (by *Charles Looman),* and *John A. Fillion* and *Jordan Rossen,* for plaintiffs.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *James D. Tracy, Cameron H. Piggott* and *Baylee Reid),* for defendant Universal Engineering.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Felix E. League,* Assistant Attorney General, for defendant Michigan Employment Security Commission.

Amici Curiae:

*Beaumont, Smith & Harris* (by *Dwight H. Vincent* and *J. Walker Henry),* for Michigan Manufacturers Association, and others.

Before: BASHARA, P.J., and V. J. BRENNAN and R. M. MAHER, JJ.

V. J. BRENNAN, J. The facts giving rise to the present controversy are set forth in the dissenting opinion of Judge BASHARA. The question to be resolved is whether the unemployment of the plaintiffs at bar was the result of a labor dispute in active progress.

As Judge BASHARA points out, the pertinent inquiry concerns the "efficient cause" of the unemployment. Accordingly, if the primary or controlling reason for the lockout is adverse economic conditions, then the resultant unemployment is not "due" to a labor dispute. As stated by Judge BASHARA this is a question of fact. However, upon my review, the record sufficiently indicates that the lockout was prompted almost entirely by economic factors. Thus the Board's decision is not supported by "competent, material and substantial evidence".

The collective bargaining agreement in effect prior to the lockout provided it was to remain in force:

"until June 1, 1971 and thereafter for successive periods of sixty (60) days unless either party shall, on or before the 60th day prior to expiration, serve written notice on the parties of the desire to terminate."

On April 1, 1971, the *employer* served notice to terminate and proposed a meeting to "discuss the terms and conditions for the new agreement". At the first of some 20 meetings the union made clear its willingness to continue work under the terms of the prior contract. Throughout the negotiations, the employer painted a rather bleak economic picture of the industry with decreasing sales, in-

creasing competition from abroad and a declining profit level. This was emphasized repeatedly as was the fact that the employer had fallen to a loss position.

The union restated its willingness to work without a new contract with the "understanding" that any new agreement be retroactive. The union again made it clear that it had no intention to strike. Judge BASHARA interprets the retroactivity aspect of the new agreement as a demand conditioning the union's offer to work without a contract. The record is unsupportive of this interpretation, and the union's communication is more readily interpreted as a mere optimistic assertion as to the retroactivity of any new contract. The fact that the new agreement as entered into was not retroactive is equally indicative of the nondemand nature of the retroactivity.

In any event the factual determination as to the cause of the unemployment involves a balancing of the various factors mentioned above. The union's mere assertion of retroactivity, which occurred only once and was never mentioned by the employer as precipitating the lockout, is clearly outweighed by the fact that the employer, during an economic slowdown, terminated the contract and repeatedly emphasized the general adverse economic position of the industry. Upon due consideration of the above, I conclude that the lockout was really a disguised layoff and not the result of a labor dispute. The plaintiffs are therefore entitled to MESC benefits.

I concur in Judge BASHARA's opinion relating to constitutionality and the rights of the states to enact their own unemployment compensation acts.

I will reverse.

BASHARA, P.J. (dissenting). This is an appeal

from the Genesee Circuit Court affirming a Michigan Employment Security Appeal Board's determination denying unemployment benefits to plaintiffs and upholding the constitutionality of the legislative provision under which the denial was authorized.

Plaintiffs are employees of defendant company. They were represented for collective bargaining purposes by the United Auto Workers Union. The UAW and Universal Engineering Division, Houdaille Industries, Inc., had been bound by a collective bargaining agreement which expired by its terms on June 1, 1971.

On April 1, 1971, the company gave notice of its intent to terminate the agreement as of May 31, 1971. A series of some 23 meetings were held by representatives of both sides concerning wages, seniority, length of the new contract and flexibility of the work force.

During the negotiations, the UAW expressed a desire to continue working under the existing agreement, even beyond the date of expiration. However, it indicated that such continuation of work was contingent on making any new agreement retroactive to the June 1st expiration date.

On May 26, 1971, the company sent a letter to the union announcing that unless their final proposals were accepted, it planned to close the plant. The union responded with counter proposals on May 28 and May 30.·

On May 31, 1971, the company indeed locked out its employees. Two weeks later, negotiations were resumed. The lockout was terminated on August 23, 1971. The employees returned to work without a contract. The new contract was signed and ratified on January 13, 1972. By its terms, it was effective December 27, 1971.

The employees applied to the Michigan Employment Security Commission for unemployment benefits during the period of the lockout. The multiclaimant benefit section of the MESC determined that their unemployment was due to a "labor dispute in active progress", and disqualified them from receiving benefits by virtue of MCL 421.29(8); MSA 17.531(8). This finding was confirmed by a hearing referee at an evidentiary hearing, and by the Appeal Board.

The Genesee Circuit Court upheld the Appeal Board's determination that the claimants' unemployment was due to "a labor dispute in active progress", but found that § 29(8), the applicable section of the Employment Security Act, was unconstitutional in that it deprived claimants of equal protection under the law. On motion for rehearing, the court reversed itself under the authority of *Ohio Bureau of Employment Services v Hodory*, 431 US 471; 97 S Ct 1898; 52 L Ed 2d 513 (1977).

I

Plaintiffs first contend that the finding of the Appeal Board that plaintiffs were unemployed due to a labor dispute in active progress is not supported by the evidence. The relevant portion of the applicable statute, MCL 421.29(8); MSA 17.531(8), is as follows:

"An individual shall be disqualified for benefits for any week with respect to which his total or partial unemployment is due to a labor dispute in active progress, or to shutdown or start-up operations caused by that labor dispute, in the establishment in which he is or was last employed, or to a labor dispute, other than a lockout, in active progress, or to shutdown or start-up operations caused by that labor dispute, in any other

establishment within the United States which is functionally integrated with the establishment and is operated by the same employing unit."

Any attempt to answer the question of whether, under the facts of this case, a labor dispute was in active progress must begin with a definition of the term "labor dispute". The term has been clearly defined by our Supreme Court as "a controversy between employer and employees regarding hours, wages, conditions of employment". *General Motors Corp v Employment Security Comm,* 378 Mich 110, 117; 142 NW2d 686 (1966), citing *Lillard v Employment Security Comm,* 364 Mich 401, 420; 110 NW2d 910 (1961). *Cf.,* MCL 421.29(8)(b); MSA 17.531(8)(b), MCL 423.2(b); MSA 17.454(2)(b).

We next consider the meaning of the words "due to". Plaintiffs argue that the standard must be one of absolute causation. In other words, the disqualification would occur only if the sole reason for plaintiffs' unemployment was due to a labor dispute.

Rather, I would opt for the theory espoused by the MESC as the "efficient cause" or "cause-in-fact" concept. The application of this test is to ask whether plaintiffs would have been unemployed despite the labor dispute. If so, then the unemployment was not "caused by" or "due to" the labor dispute. On the other hand, if the unemployment would have occurred because of the labor dispute, in spite of any other reason including economics, the causality necessary to prove disqualification has been established.

In point of fact, all of the cases relied on by plaintiffs in support of the "absolute cause" theory are actually cases standing for the "cause-in-fact" proposition. See *Scott v Budd Co,* 380 Mich 29; 155 NW2d 161 (1968), *Abbott v Unemployment Com-*

*pensation Comm,* 323 Mich 32; 34 NW2d 542
(1948), *Dann v Employment Security Comm,* 38
Mich App 608; 196 NW2d 785 (1972).

Finally, it should be noted that no labor dispute
is ever decided in a vacuum. Practical considera-
tions such as economics guide both management
and labor in determining whether a strike or
lockout should be effectuated, and how long it
should be in effect.

Having defined the terms, we are thus led to a
resolution of the question. The issue is one of fact.
*Bedwell v Employment Security Comm,* 367 Mich
415; 116 NW2d 920 (1962), *Baker v General Mo-
tors Corp,* 74 Mich App 237; 254 NW2d 45 (1977).

By constitution, statute and case law, findings of
the Appeal Board must be left undisturbed as long
as they are supported by competent, material and
substantial evidence on the whole record. Const
1963, art 6, § 28; MCL 421.38(1); MSA 17.540(1),
*King v Calumet & Hecla Corp,* 43 Mich App 319;
204 NW2d 286 (1972).

A review of the record reveals the existence of
substantial evidence in support of the findings of
the Appeal Board. From April 1, 1971, until the
May 31, 1971, termination date, the parties met
more than 20 times in an attempt to resolve
differences so that a new agreement could be
reached. Various proposals and counter-proposals
were offered. When the company advised the union
that it would cease operations on May 31, 1971,
the union countered that its members would con-
tinue to work under the old agreement as long as
any future agreement would be retroactive to June
1, 1971.

The labor dispute still existed when the em-
ployees returned to work on August 23, 1971, and
throughout the time the company and union re-

established and continued negotiations. In fact, a subsequent agreement was not accepted and approved by both parties until January 13, 1972.

I must conclude that there is competent, material and substantial evidence to support the Appeal Board's decision to disqualify the plaintiffs under the statute.[1]

## II

Having determined plaintiffs' disqualification under the Michigan statute, I now address the issue raised concerning its constitutionality. Plaintiffs contend the statute violates the equal protection clause of both the United States and Michigan Constitutions.

The United States Supreme Court has clearly spoken to the issue. In *Ohio Bureau of Employment Services v Hodory, supra,* the Court reviewed the constitutionality of an Ohio unemployment statute which disqualified an employee who was furloughed as a result of a strike at another plant owned by the claimant's employer. In upholding the statute as not violative of equal protection, the Court said that,

"The statute does not involve any discernible fundamental interest or affect with particularity any protected class. * * * the test of constitutionality, therefore, is whether the statute has a rational relation to a legitimate state interest. Brief for Appellee 29. See *New Orleans v Dukes,* 427 US 297 [96 S Ct 2513; 49 L Ed 2d 511] (1976). Our statement last Term in *Massachusetts*

---

[1] I recognized that another panel of this Court has reached what appears to be an opposite result in *Smith v Employment Security Comm,* 89 Mich App 212; 280 NW2d 489 (1979). The facts recited in *Smith* appear to be distinguishable from those in the case at bar. I further note that *National Gypsum Co v Administrator, Louisiana Dep't of Employment Security,* 313 So 2d 230 (La, 1975), relied on by the *Smith* Court, is a minority holding among American jurisdictions.

*Bd of Retirement v Murgia,* 427 US 307 [96 S Ct 2562; 49 L Ed 2d 520] (1976), explains the analysis:

" 'We turn then to examine this state classification under the rational-basis standard. This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary. *Dandridge v Williams,* [397 US 471] 485 [90 S Ct 1153; 25 L Ed 2d 491 (1970)]. Such action by a legislature is presumed to be valid.' Id., at 314 [96 S Ct 2562; 49 L Ed 2d 520]." 431 US at 489.

The Court, quoting extensively from *Dandridge, supra,* summarized its holding as follows:

" 'If the classification has some "reasonable basis", it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v Natural Carbonic Gas Co,* 220 US 61, 78 [31 S Ct 337; 55 L Ed 369 (1911)].' *Dandridge v Williams,* 397 US at 485. The rationality of this treatment is, of course, independent of any 'innocence' of the workers collecting compensation." 431 US at 491.

In Michigan, our Supreme Court has repeatedly said that the equal protection clause of the Michigan Constitution affords "the same rights as the Federal equal protection clause", *Fox v Employment Security Comm,* 379 Mich 579, 588; 153 NW2d 644 (1967). See also *Moore v Spangler,* 401 Mich 360; 258 NW2d 34 (1977), *Wolodzko v Wayne Circuit Judge,* 382 Mich 528; 170 NW2d 9 (1969). I must conclude that the Michigan Supreme Court would also apply the *Hodory* test of minimal scrutiny using "any rational basis" as its standard of review.

Plaintiffs contend that the plurality opinion in

*Manistee Bank & Trust Co v McGowan,* 394 Mich 655; 232 NW2d 636 (1975), dictates that the "substantial relation to the object" test is applicable. However, the criteria necessary for application of the test in *Manistee Bank,* (1) that there be an exception to a common-law or general rule and (2) that the exception is no longer experimental, do not appear to be present in the instant matter.

It should be noted that subsequent decisions have limited the "substantial relation" test to the unique circumstances of each case. See *e.g., McAvoy v H B Sherman Co,* 401 Mich 419; 258 NW2d 414 (1977), *Cruz v Chevrolet Grey Iron, Division of General Motors Corp,* 398 Mich 117; 247 NW2d 764 (1976).

In *McAvoy,* the Supreme Court held:

"In the case at bar, it becomes immediately apparent that the thrust of the legislation challenged is primarily social and economic. The legislation involved deals with property rights, not fundamental rights. Therefore, the burden is on the appellants to show the classification is arbitrary and does not bear a rational relation to the object of the legislation." 401 Mich at 453-454.

Our inquiry must lead us, then, to determine if there is *any* rational basis for which the classification encompassed by § 29(8) was created.

First, the purpose of the Michigan Employment Security Act, as articulated in § 2, MCL 421.2; MSA 17.502, is to provide interim unemployment benefits for those who suddenly find themselves unemployed through no fault of their own. *I M Dach Underwear Co v Employment Security Comm,* 347 Mich 465; 80 NW2d 193 (1956). It seems reasonable to conclude that the Legislature did not think those employees involved in a labor dispute would fit the purpose of the act. There

exists, therefore, a rational basis for the legislative action whether one agrees or disagrees with the proposition.

The second purpose of the act, and specifically § 29(8), is to insure that the state remains neutral in labor disputes. Thus if either a strike or a lockout exists at a particular plant, the state will not investigate to determine who is right or wrong in the dispute. MESC will determine only if a labor dispute does in fact exist and whether a claimant's unemployment was due to the labor dispute. The policy of neutrality by the state has long been recognized as a worthwhile objective by the Supreme Court. See *Noblit v The Marmon Group,* 386 Mich 652; 194 NW2d 324 (1972), *Lillard, supra,* and *Buzza v Unemployment Compensation Comm,* 330 Mich 223; 47 NW2d 11 (1951).

I would hold that the statutory provision meets not only the "rational basis" test, but that it also bears a substantial relation to the purpose of the law. It is not violative of the plaintiffs' right to equal protection regardless of which standard of review is employed.

## III

Plaintiffs also contend that the Federal labor law under the National Labor Relations Act preempts the rights of states to disqualify employees affected by a labor dispute from receiving unemployment compensation benefits.

As plaintiffs argue, the United States Supreme Court specifically reserved the question in *Hodory, supra.* However, the Court in this case did uphold similar statutory schemes involving the Social Security Act and the Federal Unemployment Tax Act.

The United States Supreme Court, in a recent plurality opinion, upheld a New York unemployment compensation statute against a Federal preemption challenge. *New York Telephone Co v New York State Dep't of Labor,* — US —; 99 S Ct 1328; 59 L Ed 2d 553 (1979). This decision is equally applicable to the claims of the plaintiffs in the instant case. Therefore, it must be concluded that Federal law has not preempted the legislative scheme found in § 29(8) of the Employment Security Act.

I would affirm the judgment of the trial court. No costs, a public question being involved.

R. M. MAHER, J. *(concurring).* I agree with Judge BRENNAN that reversal is required. I do not believe that the labor dispute exception of the Michigan Employment Security Act was intended, regardless of circumstances, to disqualify from benefits those who are unemployed as a result of unilateral action taken by their employer.

The controversy in the case before us was initiated when the employer gave the union notice of its intent to terminate the collective bargaining agreement as of midnight, May 31, 1971.[1] The parties subsequently entered negotiations in an attempt to reach a new agreement. On May 26, 1971, the employer sent the union its "final offer" with a letter in which it indicated its intention to close the plant at midnight on May 31, 1971, because of the lack of agreement. The letter concluded:

"In consideration of the withdrawal of any and all Union demands at Universal Engineering regarding a

[1] The contract provided that although the agreement expired on June 1, 1971, it would continue in effect for successive 60-day periods until either party gave notice of its intent to terminate the agreement not less than 60 days after the date of the notice.

Houdaille Council, including the demand for a Houdaille Council step in the Grievance Procedure, Universal Engineering will continue to operate the Frankenmuth plant through June 4 to facilitate the current negotiations and to permit the Union to hold necessary meetings to vote on the Company final proposal. *Operations of the plant after June 4 is subject to settlement of the current labor dispute.*

"The Company stands ready to continue negotiations at any time." (Emphasis added.)

The union responded with counter-proposals, and stated:

"This proposal is made on the basis of the Company withdrawing all the demands listed in the first paragraph of the Company's proposal made May 26, 1971. Also, settlement of all other non-economic issues as presented by the Union. Plus, we are willing to bargain past May 31 until an agreement is reached. We have no intention of striking the plant with the understanding any agreement will be retroactive to June 1, 1971. *We want to make it clear we have no intention of striking the plant at this time."* (Emphasis added.)

Although both parties indicated a willingness to continue bargaining, the employer was willing to bargain only until June 4, while the union was willing to bargain until an agreement was reached. Although the union mentioned retroactivity of any agreement in connection with its willingness to continue working, it then repeated that it had no intention of striking without any mention of conditions which must be met. The employer, on the other hand, stated unequivocally its intention to close the plant unless agreement was reached by June 4. The facts that the employees subsequently returned to work without a contract and that the new collective bargaining agreement, when concluded, was not retroactive support the

conclusion that the employees' willingness to work was not contingent upon the new contract being retroactive.

There is considerable evidence in the record indicating that the employer was experiencing a business decline which resulted in at least one layoff and might have been expected to have caused more layoffs had there been no lockout. On the other hand, the union had not threatened to strike, no strike vote had been taken, and no picketing took place during the lockout. Looking at the record as a whole, I think it is clear that this "labor dispute" was initiated entirely by the employer and that the "lockout" was a unilateral action by the employer which was precipitated not by the actions of the union or the employees, but by the economic status of the employer's business. Under these circumstances, I am of the opinion that the labor dispute exception should not be applied to deny the employees benefits.

The basic principles which must be kept in mind in evaluating unemployment benefits claims which arguably come under the labor dispute exception were recently summarized in *Baker v General Motors Corp,* 74 Mich App 237, 247; 254 NW2d 45 (1977), *lv gtd* 402 Mich 828 (1977):

> "The Michigan Employment Security Act is intended to provide relief from the hardship caused by involuntary unemployment. As the purpose of the act is remedial, it is to be liberally construed. MCL 421.2; MSA 17.502, *Noblit v The Marmon Group,* 386 Mich 652; 194 NW2d 324 (1972), *Salenius v Employment Security Comm,* 33 Mich App 228; 189 NW2d 764 (1971). Conversely, the disqualification provisions of § 29 are to be read narrowly. *Salenius v Employment Security Comm, supra.* Nevertheless,
> " 'All interested parties who are involved in a claim for unemployment compensation * * * must be dealt

with on an impartial basis. The unemployment compensation fund should never be used to finance claimants who are directly involved in a labor dispute, nor should it ever be denied to claimants who are legally entitled to receive benefits. * * * None of the money accumulated in this fund should ever be disbursed for the purpose of financing a labor dispute nor should it be illegally withheld for the purpose of enabling an employer to break a strike. The State of Michigan, in so far as this act is concerned, must remain neutral in all industrial controversies.' *Lawrence Baking Co v Unemployment Compensation Comm*, 308 Mich 198, 213; 13 NW2d 260, 265; 154 ALR 660, 669 (1944), *cert den* 323 US 738; 65 S Ct 43; 89 L Ed 591 (1944)."

The responsibility of this Court is to assure that the purpose of the Employment Security Act is fulfilled without compromising the neutrality of the State of Michigan toward labor-management controversies. Just as unemployment compensation benefits may not be used to support employees during a strike, so too denial of benefits may not be used to strengthen the position of an employer who has locked out employees who are willing to work. Where the record reveals that the contract was terminated at the option of the employer, an absolute deadline for settlement was imposed unilaterally by the employer and a lockout was instituted without any provocation by the employees, who continued willing to work and to negotiate, I am convinced that the labor dispute exception does not apply.

Just as economic factors invariably play a part in determining tactics of both labor and management during any labor dispute, there is in times of economic instability almost always "a controversy between employer and employees regarding hours, wages, conditions of employment". *General Motors Corp v Employment Security Comm*, at 117,

quoted in Judge BASHARA's opinion. To permit the employer to escalate that controversy, unilaterally and at will, to the point of a lockout, and then to permit him to use the labor dispute exception to deny his employees unemployment compensation benefits, is to subvert both the aim of the act and the policy of neutrality in labor disputes. Although the courts have historically been reluctant to inquire into the merits of a labor dispute, *Lawrence Baking Co v Unemployment Compensation Comm, supra,* I believe that we are not precluded from inquiring into the question whether the labor dispute in fact precipitated the layoff.

The burden rests on the employer to prove that the labor dispute exception applies, *Salenius v Employment Security Comm,* 33 Mich App 228; 189 NW2d 764 (1971). While I agree that lockouts might be a legitimate weapon in a bona fide labor dispute, where negotiations are continuing, no strike is imminent, the employees are willing to continue work without a new contract, and no other action has been taken against the employer by the union, by any group of employees or by anyone with whom the employees share a community of interest, the employer has simply not carried his burden of establishing that the labor dispute *caused* the lockout. See *Scott v Budd Co,* 380 Mich 29; 155 NW2d 161 (1968). The mere fact that negotiations are underway does not automatically bring a lockout within the labor dispute exception. See *Salenius, supra, Smith v Employment Security Comm,* 89 Mich App 212; 280 NW2d 489 (1979).

The Attorney General in his brief points out that the statutory section in question expressly provides that a lockout in another establishment of the same employer which is functionally inte-

grated with the establishment in which the claimant is employed does not disqualify the claimant from benefits, but that no express lockout exception is made for labor disputes in the establishment in which the claimant is employed. From this, the Attorney General argues that any lockout in the same establishment in which a claimant is employed per se disqualifies him from benefits, whatever the genesis of the lockout. I do not agree that the express exception for lockouts in other establishments compels the conclusion that the Legislature intended that any lockout in the establishment in which the claimant is employed would disqualify him for benefits, without regard to the genesis of the lockout. I am of the opinion that the Legislature simply intended that no claimant would be disqualified because of a lockout at a plant other than that at which he is employed whatever the circumstances of that lockout. As to lockouts in the establishment in which the claimant is employed, I agree that in a labor dispute where, for example, the employees are no longer willing to bargain, or where ultimatums are delivered or concessions demanded as a condition of continuing work, or a strike or a slowdown is threatened, and a lockout results, employees are disqualified from receiving unemployment compensation benefits under MCL 421.29(8); MSA 17.531(8). *Cf., Salenius, supra,* and *Michigan Tool Co v Employment Security Comm,* 346 Mich 673; 78 NW2d 571 (1956). Where an employer locks out employees who are willing to work and to continue peaceful negotiations, however, I agree with the view expressed in *Smith v MESC, supra,* that the employees are not disqualified from benefits.

I therefore concur in Judge BRENNAN's opinion for reversal.