**MEAD PRODUCTS, A DIVISION OF THE MEAD CORPORATION, Appellant,**

v.

**The INDUSTRIAL COMMISSION OF MISSOURI, et al., Respondents.**

No. WD 34151.

Missouri Court of Appeals, Western District.

Aug. 16, 1983.

R. Dan Boulware, St. Joseph, for appellant; Watkins, Boulware, Lucas & Miner, St. Joseph, Dean E. Denlinger, Smith & Schnacke, Cincinnati, Ohio, of counsel.

Alan Downs, Jefferson City, for Industrial Com'n of Mo.

Sharon Ann Willis, Kansas City, for Div. of Employment Sec.

Morris J. Levin of Levin & Weinhaus, St. Louis, for Mo. State Labor Council, AFL–CIO; Jerome J. Dobson, St. Louis, of counsel.

Stephen J. Briggs and Ronald S. Reed, Jr., St. Joseph, for Stephen E. Abels et al.; Morton, Reed & Counts, St. Joseph, of counsel.

Before TURNAGE, P.J., and PRITCHARD and KENNEDY, JJ.

PRITCHARD, Judge.

Claimants, 563 in number, were employees at appellant's St. Joseph, Missouri, plant and members of the Graphic Arts Union, Local 529. Claimants each filed requests for unemployment compensation benefits for the period from December 17, 1979 until January 7, 1980, contending that they were laid off from work. Appellant contends that claimants' unemployment was due to a lockout resulting from a labor dispute which caused a work stoppage and, therefore, claimants are barred from receiving unemployment compensation for a work stoppage under the express provisions of Section 288.040.5(1) RSMo. 1978.

An appeals referee found, as did deputies of the Division of Employment Security, that claimants were unemployed from December 17, 1979 until January 7, 1980, because of a stoppage of work which existed because of a labor dispute, and the claims were denied. The Industrial Commission reversed the Appeals Tribunal and found that claimants were entitled to employment security benefits during the weeks claimed. The circuit court affirmed the Commission.

It was stipulated before the Appeals Tribunal: Appellant and the Union had entered into a collective bargaining agree-

ment with an effective date of November 1, 1976, and a termination date of October 31, 1979; prior to the expiration date, the Union notified appellant of its desire to negotiate new terms and conditions; the contract expired without settlement of the contract negotiations, which commenced on October 1, 1979; thereafter, employees continued working without a contract and negotiations continued; and on November 8, 1979, appellant made its "final offer" to the Union Bargaining Committee, which was rejected. Thereafter, certain notices were sent by appellant to employees and the Union, and its Senior Executive spoke to its members at a meeting, which matters are hereinafter mentioned. From December 17, 1979, to January 7, 1980, appellant's employees who were members of other Unions continued working without interruption.

Quite apparently shouldering their laboring oar, claimants presented this evidence, which is included in the transcript of the record considered by the Industrial Commission: Larry L. Huston testified that he had been employed by appellant for 15 years, and was the Union's business representative for 6 years. The plant was first unionized in 1941, and since that time there has been only one strike, which occurred in 1974. After the expiration of the contract, claimants continued to work without a contract, and during negotiations for a new contract, the union team never refused to meet with the company management personnel team, and never directly threatened any type of strike action. On November 19, 1979, appellant posted a notice that there would be work for only three days a week because of production problems caused by uncertainty of contract negotiations, economic conditions, high inventory levels and customer requirements.

On December 16, 1979, Huston was present for the normal starting time of the third shift, at about 10:15 or 10:30 p.m., at the employees' entrance. The door was locked and upon Huston's knock, Paul Montegna, appellant's then production manager, talked to him. Huston told him his people were ready to come to work and report in.

Montegna answered that there was no work available and that "your people are laid off—or something similar to that." Huston told the people to go home. He was at the plant the next morning at the starting time of that shift, and told him that his people were ready and willing to report for work, and Montegna repeated [twice] that there was no work available, and "your people are laid off." Huston testified that the slack season at the plant, as a general rule, is from September to February or March—it varies. Around the Christmas holidays, it was traditional for the employees of his bargaining unit to request vacations. Ray Allen was present with Huston when Montegna told him that there was no work available, that they were laid off, on both December 16th and 17th. Allen was present alone at the 3:00–3:30 shift on the latter date, and told Montegna they were ready to go to work. "Q And what did Paul say at—well, what was his response at the time, at 3:30? A Paul threw me a curve. I thought we had it down pat because this was the third time around and the reply wasn't the same, it was, you're— are locked out. So, took me for a second and I said, wait a minute Paul, I said, 'locked out' or 'laid off', what is it? And he said, locked out or laid off, it's the same difference, it's the same difference, there's no difference he said, there's no work available."

Paul Montegna testified that on the three occasions when claimants reported for work he told Huston twice that there was no work available for their union and that they were laid off. He used the term "lockout" once the next morning (December 17th) to Huston, and told Allen that afternoon that they were "locked out, there's no work available." "I told them they were locked out or laid off, it didn't make any difference how I put it." The reason for the company's position at the time reflected in the statement Montegna gave to the employees—the reason they were locked out was the labor dispute, which was when the final contract offer was rejected. The meanings of the terms "lockout" and "laid

off" were the same to Montegna, and he was so told by their attorney. As to the seasonal nature of the work, Montegna testified that under normal conditions, it would start building up around the middle of December, "and it's just gradual build up until we eventually get up in February, we're almost at full employment and we peak out around July." This differed from the testimony of Huston that the slack season is, as a general rule, from September to February or March. "It varies."

George Carolus was appellant's operations manager at the times here in question, and was head of its bargaining committee. The Union rejected appellant's final offer of a new contract of November 8, 1979, by a vote of a large majority of its members on November 17, 1979. Appellant's decision was to institute a three-day work week, followed by a decision to have a short lockout. [The posted notice to Union members, dated November 19, 1979, recited: "Because of production problems caused by uncertainty of contract negotiations, economic conditions, our high inventory levels, and customer requirements, we will need to start working only three days per week until further notice, * * *."] A newspaper article reporting the failure of contract negotiations and a complaint filed with the NLRB, was a factor in appellant's decisions. It was its understanding that in a lockout situation employees would not draw unemployment compensation.

As to the seasonal nature of appellant's work in December 1979, Carolus had this to say: There was then sufficient work for all claimants to remain employed; they were all employed prior to the three-day work week cutback. There was no difference in the economic conditions of the company during that few work week period. Orders were not any less, and demands on the system were just as great; and there was no reduction in availability of supplies and raw material. The only reason for making a decision to cease operations was lack of progress in contract negotiations. A part of the plant operations was transferred to other locations, and a part was just left undone. As to the seasonal nature of the work, Carolus testified that a build-up is started about the middle of December primarily to supply other divisions. The build-up continues and peaks out in July. At the highest peak, there are over 1,000 employees, and the lowest ebb is at inventory time in September, at which time there are about 400 to 500 people, who are retained until the build-up is started again. Due to the lockout, other plants were asked to assume as much production from St. Joseph as possible, but were not able to assume all of it. Consequently, appellant lost between five and seven hundred thousand dollars during the lockout.

An official of appellant (apparently its president, Bill White) spoke to union members on December 10, 1979, the talk being preserved on tape. It was noted that Fred (Stoll), a member of Mead's management, was responsible for negotiating a new contract, and any future contract would be at the union's bargaining table with Fred's team. "The next question is this: Where are the negotiations at the moment? Unfortunately we are at an impasse. I am aware there have been thirteen negotiating sessions, and that we have dealt in good faith trying hard to reach an agreement. However, the point was reached at which there was no more progress. Fred, in his efforts to be honest and straightforward with you, attempted in his letter of November 9 to outline the very serious business problems which are beginning to accumulate. He said we could not go on indefinitely, living under a cloud of uncertainty, not knowing what might happen next. He emphasized that we must make plans for the future—plans to protect your long range future by doing what was necessary to protect the business. Fred made it clear to you, just as was made clear to your bargaining committee, that the company has given you its best offer. Everything Fred said in that letter of November 9 is still true but the pressure of our business now is considerably greater. We *must* make arrangements *right away* to protect our business over the weeks and months ahead. We are reluctant to do some of the things

which the situation demands. But if we are to maintain our position in the marketplace we must act. * * * So here are our plans: First, we are making arrangements to divert 20% or more of our anticipated 1980 production to other Mead plants and outside sources. We will begin diverting orders immediately. Second, since there is no agreement on a new contract, manufacturing operations under the jurisdiction of Local 529 will be curtailed from December 17 to January 7, and there will be no work available for employees represented by Local 529. Third, should a new contract be ratified by noon, Sunday, December 16, 1979, operations will resume on a normal full schedule beginning Monday, December 17, 1979. Fourth, if a contract is ratified between December 17 and January 7, 1980, a normal full manufacturing schedule would be resumed providing work is available. The longer we go without a contract the more difficult it will be to bring work back into the plant. Finally, without a labor agreement by January 7, 1980, we will propose a three day work week on an indefinite basis. * * *."

A notice was issued to union employees: "You are being laid off effective December 17 until January 7 due to labor dispute between the company and G.A.I.U. Local 529. Foreman _____." [No date is on the exhibit of this notice.]

On cross-examination, Carolus acknowledged that he never told the union officials or the employees that the three-week hiatus in manufacturing or plant operations was specifically a lockout prior to December 16th or 17th.

Upon appeal to the Industrial Commission a remand was ordered to take additional evidence as to: "whether and to what extent the unemployment of the claimants during any weeks claimed throughout the period involved in this matter was related to seasonal fluctuations in the business of the employer." The appeals referee held the further hearing on January 15, 1981, at which this evidence was adduced: George Carolus testified that Mead Products is a division of Mead Corporation and "is a manufacturer of school supplies or paper converters of school supplies, that is, tablets, pads, note pads and etc." Mead Products services from the smallest paper job, paper wholesalers on to directly service discount stores, and department stores. Fifty-five percent of production goes to other (Mead) divisions. As to the seasonal nature of production, Carolus testified: "Well, by nature of the business school supplies, our business has to run in a cycle coinciding with school opening. Our normal—our normal bill period begins following our annual physical inventory which is normally late in September. We start building production at that time and we'll continue building in an increasing matter (sic) right after the first of the year, we normally would peak out in a production cycle in—during the months of June and July. At that time most of the shipments are going out to customers for their school opening business." A forecast of business for 1980 was made which indicated a sizeable increase over 1979, and the increase turned out to be even a great deal more than forecast. The "lockout" of December 17 absolutely did not have anything to do with production requirements. The lockout was due strictly to a negotiating tactic.

On cross-examination Carolus testified that there could be a company history of building up inventories in the fall in anticipation of contract negotiations or contract disputes. He could have ordered stock heavier than normal, and he was sure a couple of divisions did it in the fall of 1979. If there had been a build-up of inventory it would have been shipped (to other divisions) at the time of the lockout. On redirect examination, he stated that the three day work week imposed prior to December 17 was a negotiating tactic, not having anything to do with production.

In connection with the testimony of Paul Montegna, monthly and weekly lists of the number of the union's employees working were received for the years 1976 through 1980. Generally, they show the lowest number in September, at inventory time, and the number increased gradually

through December, and the peak is reached in June and July. All of the claimants would have continued working but for the lockout of December 17. Montegna further testified that appellant transferred about one million dollars to two other divisions in anticipation of the lockout, and that this production would have occurred at the St. Joseph plant had there been no lockout.

Larry Huston testified that there is an increase in production during contract years because of inventory build-up and contract negotiations. The increase in production (at St. Joseph) was due to a labor dispute at Mead's Kalamazoo plant which had been shut down for about 12 weeks. During Huston's testimony, Montegna interposed that he was involved in projecting the number of people that would be needed to complete the work after a sales forecast was made. Huston testified that he was not personally involved in that activity, and he had no independent knowledge that in fact if there had not been a lay-off, these people (claimants) would have been working.

On January 2, 1980, appellant notified employees: "This letter is to advise you that the plant will open on a three (3) day week basis beginning Monday, January 7, 1980. Please report to your regular job on your regular shift on January 7, 1980."

The essence of the Industrial Commission's findings and conclusions is that claimants were laid off work by reason of the slack time of appellant's normal seasonal operations, and not by reason of a work stoppage induced by a labor dispute. Clearly, under the evidence appellant's lowest slack time would be after it has fulfilled its school supply orders for delivery before the beginning of school years which the evidence shows it must. That time is at the inventory period in September, after which there is a gradual build-up in production and in employment to meet it to around February or March and reaching a peak in June or July when orders are ready to be delivered. Obviously, before delivery time, appellant's receipts from sales would be reduced, which would motivate it to reduce its labor force during the time here in question.

Appellant, however, and obviously, sought to have its layoff of claimants denominated a work stoppage due to a labor dispute (over contract renewal terms), so as to avoid any increase of contributions by reason of an increased experience rating because of payment of benefits, and at the same time to avoid payment of wages to claimants.

The Commission could reasonably find that appellant's communications, oral and in writing, were equivocal as to whether a reduction in week workdays was due to any dispute over a new contract or was due to the existent economic conditions. The November 19th notice listed as reasons therefor production problems caused by *uncertainty* of contract negotiations, economic conditions, high inventory levels and customer requirements. Appellant's president, in his talk to employees was no less equivocal. Although he urged a resolution of the contract terms, the major emphasis of his talk was upon the accumulation of serious business problems, protection of the business, and solutions therefor. At no time were claimants ever advised that they were locked out or laid off solely because of a labor dispute prior to whatever time the written notice to that effect was given. Certainly appellant could have specifically done that. "The dictionary definition of 'lockout' is the withholding of employment by an employer and the whole or partial closing of his business establishment in order to gain concessions from his employees. * * * An employer may in various circumstances use the lockout as a legitimate economic weapon." 48 Am.Jur.2d, Labor and Labor Relations, Section 1108, p. 895. In some contracts, the term "lay off" or "laid off" implies a temporary suspension of employment due to unavailability of work, although the term could be qualified to be due to a labor dispute. Neither Montegna nor appellant's president referred to the reason for the lockout as being a labor dispute. Montegna told claimants there was no work available. The president told them there would be no work available from December 17 to January 7.

The Commission made these further findings and conclusions: "It appears that the employer notified the union of a pending lay-off due to economic uncertainty and high inventory levels as well as contract negotiations. It appears from the evidence that at all times the claimants were willing to work. They indeed arrived at the job site as usual, fully prepared to work, when they were told that they were 'laid off'. At the time of this occurrence, when representatives of the employer were pressed to explain whether the situation was a lock-out, the representatives refused to say that it was. The evidence shows that the weeks of unemployment involved here occurred during the employer's slack season. All of these factors taken into account, the Commission cannot find that the unemployment of these workers was the result only of a labor dispute, rather than a business decision of the employer more related to economic and seasonal conditions of the employer's business. *The employer failed in its burden of proof.*" [Italics added.]

"Testimony of witnesses for the employer attempted to show that the high inventory levels and economic conditions originally cited as reasons for the lay-off were related to the uncertainty of contract negotiations. These witnesses testified that had a contract been established prior to the weeks of unemployment these other problems would not have existed. The Commission is not persuaded by this testimony. The Commission finds that this testimony is designed to disguise this lay-off for business reasons as a lock-out resulting from a labor dispute, in order to disallow the benefits to the claimants. But viewing this evidence in a most favorable light, it tends to show that uncertain customer requirements and high inventories were factors which existed merely because it was a year of contract renewal between the employer and claimants' union. These conditions appeared before the old contract expired and before the breakdown, if any occurred, of negotiations for a new one. The conditions appear to have been caused not by a labor dispute, but the mere anticipation of one by some customers and by the employer."

The findings and conclusions of the Commission appear to be sufficiently supported by competent and substantial evidence upon the whole record, which is the standard for review of its decision. Const. Mo. Art. V, Section 18; Section 288.210, which section provides that if the facts are supported by competent and substantial evidence and in the absence of fraud, the findings shall be conclusive. In *Chemtech Industries, Inc. v. Labor and Industrial Relations Commission, Etc.,* 617 S.W.2d 121, 123 (Mo.App.1981), it was said, "We must defer to the Commission's findings of fact. The Commission could believe or disbelieve all, none or any part of the testimony even when the testimony is produced by only one of the interested parties. We view the evidence in the light most favorable to the Commission's decision. We may set aside the Commission's findings only if they are clearly contrary to the overwhelming weight of the evidence. (Citing case.)" Reasonable inferences which the Commission could draw from the evidence must be considered upon review. *Bryant v. Labor and Industrial Relations Commission,* 608 S.W.2d 524, 526 (Mo.App.1980). [One such inference which the Commission did not mention is that the failure of contract negotiations did not have anything to do with the cessation of work because appellant, on January 2, 1980, issued a notice to all employees to return to work without a contract on the same shortened week as existed prior to the time claimants were laid off, and that the real reason was the economic slack season.] Compare these cases from other states, holding that the evidence justified the finding that work stoppages were due to business reasons, not a labor dispute: *Kansas City Star Co., etc. v. Department of Industry, Labor & Human Relations,* 60 Wis.2d 591, 211 N.W.2d 488 (1973); *Doerr v. Universal Engineering Division,* 90 Mich. App. 455, 282 N.W.2d 352 (1979); and *Gulf Atlantic Warehouse Co. v. Bennett,* 36 Ala. App. 33, 51 So.2d 544 (1951).

The evidence here and the reasonable inferences to be derived therefrom

would justify the Commission to find either that the work stoppage was due to a labor dispute, or that it was the result of economic and business reasons. The Commission chose the latter. In this situation of justification of two opposed findings, the appellate court is bound by the determination of the administrative body, and it is irrelevant that there is supportive evidence for the contrary finding. *Board of Education, Mt. Vernon Schools v. Shank,* 542 S.W.2d 779, 782 (Mo. banc 1976); *Overland Outdoor Advertising Co., Inc. v. Missouri State Highway Commission,* 616 S.W.2d 563, 566 (Mo. App.1981).

■ Appellant complains that the Commission erred in placing the burden of proof upon it as per the above italicized words in the conclusions. The Commission relied upon cases from other jurisdictions holding that the burden of proof is upon the employer to show that a bona fide dispute caused the unemployment because the employer seeks the advantage of the provision to disallow benefits, and that it is held to account for the reason for the layoff of employees. Cited were *Dalton Brick & Tile Company v. Huiet,* 102 Ga.App. 221, 115 S.E.2d 748, 750 (1960); and *Dann v. Sorensen-Gross Construction Co.,* 38 Mich.App. 608, 196 N.W.2d 785 (1972). The reasoning is of some persuasion, but the trouble is that the Missouri Supreme Court pronounced as to the burden of proof in unemployment compensation cases in *Producers Produce Co. v. Industrial Commission,* 365 Mo. 996, 291 S.W.2d 166, 173[4–8] (1956), saying, "The express disqualification provided by Sec. 288.120 [now Sec. 288.040, supra] was not a matter of defense. It was not a matter of a statutory *exception* to a general rule granting benefits, but it was an express disqualification. The burden was on claimants to show they met the conditions required for benefits." This court is bound by the holding in the Producers Produce case, which has not been changed, and the Commission erred in stating that the burden of proof was upon appellant to show that a labor dispute existed which caused the work stoppage. As above held, however, there is sufficient competent and substantial evidence to support the award of benefits.

The judgment is affirmed.

All concur.